25 P.3d 749

**Harry BROWNE; Marcene Candelaria; and Peter Schmerl, Plaintiffs–Appellants,**

v.

**Betsey BAYLESS, Secretary of State of Arizona, Defendant–Appellee.**

No. 1 CA–CV 00–0546.

Court of Appeals of Arizona, Division 1, Department B.

May 29, 2001.

As Corrected June 1, 2001.

Christopher J. Raboin, Phoenix, Attorney for Plaintiffs–Appellants.

Janet A. Napolitano, Attorney General, by Thomas J. Dennis, Assistant Attorney General, and Joseph A. Kanefield, Assistant Attorney General, Phoenix, Attorneys for Defendant–Appellee.

## OPINION

GERBER, Judge.

¶ 1 The appellants, Harry Browne, Marcene Candelaria and Peter Schmerl (collectively referred to as "Browne"), requested an affirmative injunction requiring the Arizona Secretary of State, Betsey Bayless ("Secretary of State"), to accept Browne's late-filed petition to appear on the November 2000 Arizona ballot as an independent candidate for President of the United States. The trial court denied Browne's injunction request and ruled in favor of the Secretary of State. Browne now appeals from the trial court's ruling. He argues that the Arizona filing deadline for independent presidential candidates is unconstitutional because it unfairly and unnecessarily burdens independent candidates such as himself.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Browne was nominated for president by the Libertarian party in its national nominating convention in July 2000. However, the electors supporting his nomination were led by a person not named as the official Arizona state leader of the Libertarian party. Consequently, the Arizona Libertarian slate of electors did not name Browne as its nominee and his name did not appear on the Arizona ballot as such.

¶ 3 Believing that he would be his party's nominee, Browne did not submit the necessary signatures for the ballot as an independent candidate until after the June 14 statutory deadline. On August 17, 2000, two months after the June 14 deadline, he attempted to file with the Secretary of State his designation of electors and nominating petitions as an independent candidate under Arizona Revised Statutes Annotated ("A.R.S.") section 16–341 (Supp.2000).

¶ 4 When the Secretary of State refused to accept Browne's designation of electors and nominating petitions, he brought a complaint against that office seeking injunctive relief and a declaratory judgment that A.R.S. section 16–341 was unconstitutional. The trial court found the statute constitutional, denied his request for injunction and dismissed his complaint. Browne timely appeals. We have jurisdiction under A.R.S. sections 12–120.21(A)(1) (1992) and 12–2101(B) (1994). We reverse because we find the statute unconstitutional.

## DISCUSSION

### I. MOOTNESS

¶ 5 The Secretary of State argues that Browne's claims are moot. A case becomes moot "when an event occurs, pending an appeal, which renders the relief sought either impossible or without practical effect on the parties to the action." *Sandblom v. Corbin,* 125 Ariz. 178, 182, 608 P.2d 317, 321 (App.1980). We may consider a moot appeal if it presents significant questions of public importance that are likely to recur. *Fisher v. Maricopa County Stadium Dist.,* 185 Ariz. 116, 119, 912 P.2d 1345, 1348 (App.1995). The constitutionality of A.R.S. section 16–341 is of public importance and Browne's untoward experiences could well recur with other independent presidential candidates. We accordingly decide that mootness presents no reason to avoid the issues raised.

### II. LACHES

¶ 6 The Secretary of State argues that Browne's challenge is barred by laches because he waited until August 17, 2000 to file his petitions when he knew the statutory

deadline was June 14. "[Laches] is an equitable counterpart to the statute of limitations, designed to discourage dilatory conduct. [It] will generally bar a claim when the delay is unreasonable and results in prejudice to the opposing party." *Sotomayor v. Burns*, 336 Ariz. Adv. Rep. 35, 36, ¶ 6, 13 P.3d 1198, 1199–1200 (2000).

¶ 7 Though Browne was nominated as the national Libertarian party candidate on July 2, 2000, he was not nominated as the Arizona party candidate on that date. In response to his local party's non-support, on or about July 16, 2000, he decided to run in Arizona as an independent candidate. He promptly gathered signatures and filed his petition on August 17, 2000. When the Secretary of State rejected that petition, Browne filed a complaint with the superior court the next day. Given his diligence, we find that laches does not bar his action.

## III. STANDING

¶ 8 The Secretary of State next contends that Browne lacks standing because he argues that the filing deadline is unconstitutional for independent candidates while he is affiliated with a recognized political party. She further argues that Browne's absence from the ballot was due to "intra-party squabbling" rather than his inability to timely file petition papers as an independent.

¶ 9 Browne was not formally endorsed by any political party in this state and therefore had to run as an independent candidate to appear on the Arizona ballot. Moreover, even a party-affiliated candidate may run as an independent. As such, Browne has standing to challenge the independent candidate filing deadline. Furthermore, one reason he did not appear on the ballot was that he missed the very filing deadline that he now asserts is unconstitutional. Given these factors, we conclude that Browne has standing to raise these issues.

## IV. CONSTITUTIONALITY OF A.R.S. SECTION 16–341

¶ 10 On the merits, Browne argues that A.R.S section 16–341 is unconstitutional because its June 14 deadline is unnecessarily restrictive. He also contends that the dead-line treats independent presidential candidates dissimilarly from candidates of recognized parties. He further states that the Secretary of State cannot identify any valid administrative reason for a filing deadline 146 days prior to the November general election.

¶ 11 Browne relies heavily on *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), to support his arguments. In that case, Anderson, a Republican not nominated by his party, announced on April 24, 1980 that he would run as an independent candidate for president. On May 16, his supporters tendered a nominating petition and statement of candidacy to the Ohio Secretary of State, who refused to accept the documents because they were submitted after the March 20 deadline then required by the Ohio statute. *Id.* at 782–83, 103 S.Ct. 1564.

¶ 12 The Supreme Court found the Ohio deadline unconstitutional because it burdened the association rights of independent voters and candidates and placed significant restrictions on the nationwide presidential electoral process. *Id.* at 795, 103 S.Ct. 1564. The Court found that the deadline discriminated against political party candidates and voters with preferences outside the two dominant political parties. *Id.* at 794, 103 S.Ct. 1564.

¶ 13 The Court also stated that the propriety of state election deadlines cannot be resolved by any "litmus-paper test." Instead, a balancing test is involved:

> [A] court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to bur-

den the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* at 789, 103 S.Ct. 1564. Because the *Anderson* facts closely mirror the facts of this case,[1] we adopt and apply its analysis to Browne's situation.

## A. THE BURDEN

¶ 14 Under *Anderson's* analytical framework, we must first determine if Arizona's June 14 deadline burdens ballot access and, if so, the magnitude of that burden. *Id.* Not all restrictions on candidates' eligibility for the ballot constitutionally burden voters' rights to associate or to choose among candidates. *Id.* at 788, 103 S.Ct. 1564. To achieve fair elections, the state may impose comprehensive and sometimes complex election requirements. Although these regulatory schemes necessarily affect the rights of some individuals to vote, the state's regulatory interests might justify them if they are reasonable and non-discriminatory. *Id.*

¶ 15 The present Arizona statutory scheme requires independent candidates to declare their candidacy by filing nomination petitions on the same date that the two major parties file their slates of electors without, however, identifying their candidates. *See* A.R.S. §§ 16–311 (Supp.2000), 16–341. This deadline is only facially equal; it actually treats differently-situated candidates alike in a way that can be grossly discriminatory. *Anderson,* 460 U.S. at 799–801, 103 S.Ct. 1564. "An early filing deadline may have a substantial impact on independent-minded voters." *Id.* at 790, 103 S.Ct. 1564. The slates of electors filed by the major parties need not reveal the identity of their candi-

date[2] nor the content of their platforms. Because the major parties need not, and indeed usually do not, pick their candidates until their late summer national conventions,[3] they have the advantage of continued strategic flexibility by comparison to independent candidates who must declare themselves candidates and file by June 14. *Id.* at 791, 103 S.Ct. 1564.

¶ 16 In national election campaigns, the parties' candidates and issues remain dynamic rather than static, often up to the time of the parties' conventions. The two major parties may change their strategies and even their candidates based on topical developments. However, independent candidates lack such an advantage after they are locked in by the June 14 deadline. If a major party changes its platform or one major party candidate's popularity rises, an early state deadline prevents a dissatisfied independent candidate from deciding to run. *Id.* at 790, 103 S.Ct. 1564. A deadline that forces independent candidates to declare earlier than major party candidates poses "a particular burden on an identifiable segment of ... independent-minded voters." *Id.* at 792, 103 S.Ct. 1564.

¶ 17 Arizona's June 14 deadline ties independent candidacy to the major parties' primaries even though the independent candidate does not participate in such primaries. Such a primary-based deadline affords no benefit to the independent candidate by comparison with a major party candidate who acquires organizational support precisely through primary successes. *Id.* at 800–01, 103 S.Ct. 1564. "A burden that falls unequally on ... independent candidates impinges, by its very nature, on associational

---

1. Admittedly, there are some differences between A.R.S. section 16–341 and the statute examined in *Anderson:* (1) the Ohio statute imposed a more stringent deadline for independent candidates than for recognized political party candidates; (2) the Arizona filing deadline is 146 days prior to the election compared with the Ohio deadline of 229 days; and (3) Ohio did not allow independent candidates an alternative means of access after the deadline as Arizona does (write-in candidates). However, these differences do not invalidate the *Anderson* analysis.

2. In her affidavit, the State Election Director stated that the state party chair of each major party typically sends her a letter identifying who won the nomination at the party's national convention. When these letters arrive and whether they are filed is unknown, although we note that recent presidential conventions have occurred in late July or early August, the prelude to sending these letters.

3. Arizona does have a presidential preference election early in the year. A.R.S. §§ 16–241 and 16–242 (Supp.2000). However, the major parties are not required to participate.

choices protected by the First Amendment. It discriminates against the candidates and ... those voters whose political preferences lie outside the existing political parties." *Id.* at 793–94, 103 S.Ct. 1564.

¶ 18 In oral argument on appeal, counsel for the Secretary of State conceded that the June 14 deadline placed a burden on the rights of the voters. We find that the deadline does impose a suspect burden because it treats independent candidates dissimilarly from the major parties' candidates, thereby substantially impacting the rights of the voters as well.

## B. THE STATE'S INTERESTS

¶ 19 Under *Anderson,* after determining the extent of the suspect burden, we must identify the Secretary of State's proffered interests in the existing deadline, determine their legitimacy and whether those interests justify the burden. *Id.* at 789, 103 S.Ct. 1564. In a national presidential election, "a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders." *Id.* at 795, 103 S.Ct. 1564. A state's reasons for requirements on a national election must exceed those for its local elections. These national election requirements cannot impose "significant state-imposed restriction[s] on a nationwide electoral process." *Id.* Given that Arizona's June 14 filing deadline impacts the national presidential election and imposes a suspect burden as described above, the state's requirements must be narrowly drawn.

¶ 20 At oral argument on appeal, the Secretary of State's counsel conceded that the office does not need 146 days before the November election to prepare the Arizona presidential ballots. Historically, her earliest obligation after the June 14 deadline has been formatting the ballots to allocate space for the lists of electors and ordering a sufficient quantity of ballot paper, the latter task usually performed about July 1. However, the ballots can be formatted and an adequate amount of paper can be ordered even without knowing the exact number of independent candidates on June 14. Even if the Secretary of State needs to order more ballot

paper, that task alone, given a September 17, 2000 printing deadline, does not outweigh the burden on the independent candidates to gather their signatures and file their petition papers several weeks before those administrative chores need commence. The convenience of performing these administrative tasks before they need to be done is a trivial interest compared to the heavy burden the June 14 deadline places on independent candidates.

¶ 21 The Secretary of State next argues that the June 14 deadline is appropriate because potential legal challenges to the petitions could consume as much as four to six weeks. Aside from such speculation, the petition process takes 25 days (excluding Saturdays, Sundays and other legal holidays) plus the time needed for the supreme court to render a "prompt" decision. *See* A.R.S. § 16–351 (Supp.2000) (an elector may challenge the nomination of a candidate within ten days (excluding Saturday, Sunday and other legal holidays) after the last day of filing, the superior court must render a decision within ten days, which is appealable to the supreme court within five days; the supreme court must then render a decision "promptly"). This process of potential legal challenges does not justify such a deadline that comes months before the major political parties declare their candidates and consolidate their platforms.

¶ 22 The Secretary of State further claims that she needs time to prepare early and sample ballots and overseas ballots, as well as to translate ballots into different languages. In the past presidential election, the deadline for mailing sample and overseas ballots was October 5, 2000. *See* A.R.S. §§ 16–542 (Supp.2000) (request for early ballot) and 16–545 (early ballot must be delivered not later than the thirtieth day preceding the Saturday before the election). The Secretary of State also claims that the use of optical scanners in Arizona requires an unspecified amount of additional time, an argument seemingly related to ordering special scannable ballot paper.

¶ 23 As the Secretary of State's counsel admitted at oral argument, performance of these administrative duties need not com-

mence until well after the June 14 deadline. Moreover, although the Secretary of State must know the major party candidates in order to print the ballots, she does not know their identities until she receives letters from the major parties after their conventions in the late summer, approximately two months after the June 14 deadline. Given these facts, the Secretary of State has not justified a filing and declaration deadline for independent candidates 146 days—almost five months—prior to the general election and some two months prior to the date for designating the two major party candidates.[4]

## CONCLUSION

¶ 24 We conclude that the June 14 deadline imposed on independent candidates by A.R.S. section 16–341 impermissibly burdens the association rights of independent voters. The Secretary of State has not articulated sub-

stantial reasons for such a burden. We therefore find that the A.R.S. section 16–341 deadline of June 14 is unconstitutional. Because Browne is the successful party on appeal, he is entitled to costs upon compliance with Rule 21, Rules of Civil Appellate Procedure. We remand to the trial court to determine Browne's trial costs pursuant to A.R.S. section 12–341 (1992).

CONCURRING: JEFFERSON L. LANKFORD, Presiding Judge, JAMES B. SULT, Judge.

---

4. The Secretary of State mistakenly argues that she could not fulfill her administrative obligations given that Browne filed his petition papers on August 17. Whether August 17 is a reasonable deadline is not the issue before us because that election is complete, rendering injunctive relief impossible for that election. We must determine only if the statutory June 14 deadline is justified. Exactly which date would survive a constitutional challenge is not a question we need decide in this appeal.