IN THE SUPREME COURT OF THE STATE OF ARIZONA
En Banc

| | |
|---|---|
| HARRY BROWNE; MARCENE CANDELARIA; AND PETER SCHMERL, ) | Arizona Supreme Court No. CV-01-0383-PR |
| ) | |
| Plaintiffs-Appellants, ) | Court of Appeals Division One |
| ) | No. 1 CA-CV 00-0546 |
| v. ) | |
| ) | |
| BETSEY BAYLESS, Secretary of State ) | Maricopa County Superior Court |
| of Arizona, ) | No. CV 2000-015468 |
| ) | |
| Defendant-Appellee. ) | **O P I N I O N** |
| _____) | |

Appeal from the Superior Court in Maricopa County
The Honorable Barry C. Schneider, Judge
AFFIRMED

_____

Opinion of the Court of Appeals, Division One
200 Ariz. 261, 25 P.3d 749 (App. 2001)
VACATED

Christopher J. Raboin                                                                 Phoenix
Attorney for Plaintiffs-Appellants

Janet A. Napolitano, Arizona Attorney General                                        Phoenix
         By:    Patrick Irvine, Solicitor General
                Joseph A. Kanefield, Assistant Attorney General
Attorneys for Defendant-Appellee

ESCHER, Judge

¶1    On August 17, 2000, Betsey Bayless, the Secretary of State, refused to accept Harry Browne's designation of electors and nominating petitions to appear on the November ballot as an independent candidate for president of the United States because they were filed two months beyond the statutory deadline. Rejecting Browne's[1] claim that the filing deadline for independent candidates in A.R.S. § 16-341 violated the First Amendment, the trial court denied his request for declaratory and injunctive relief. The court of appeals reversed, holding that the statute impermissibly burdened the association rights of independent voters. *Browne v. Bayless*, 200 Ariz. 261, 25 P.3d 749 (App. 2001). The court rejected the Secretary's arguments with respect to mootness, laches and standing. We agree with the court's resolution of the latter issues. However, we conclude that § 16-341 does not impose severe restrictions on Browne's First Amendment rights and furthers important regulatory interests of the State. We therefore vacate the opinion of the court of appeals and affirm the trial court's decision.

## FACTS AND PROCEDURE

¶2    Browne began his campaign for president in Arizona as a candidate of the Libertarian Party. He received 78% of the votes for Libertarian candidate in Arizona's Presidential Preference Election on February 22, 2000. On July 2, he was nominated for president at the national Libertarian Party convention. He ultimately appeared as the Libertarian presidential candidate on the ballots of 47 states and the District of Columbia.

---

[1] The complaint for special action, declaratory judgment and injunctive relief was filed by Browne, Marcene Candelaria (as a prospective elector committed to Browne) and Peter Schmerl (as an Arizona voter who would have voted for Browne had his name been placed on the ballot). The plaintiffs will be collectively referred to as "Browne."

¶3　　　　In Arizona, however, a split developed within the state Libertarian Party, and Browne's supporters lost the battle for control of the party. The two factions submitted nomination papers for separate sets of electors to the Secretary of State by the June 14 deadline, but on June 20, Browne's electors were informed that they would not be placed on the ballot. After his nomination at the national party convention and failed negotiations with his opponents, Browne decided to campaign in Arizona as an independent candidate. He began circulating petitions to obtain the required number of signatures, and submitted his slate of electors and his nominating petition to the Secretary of State on August 17. The Secretary refused to accept the filing as untimely, and Browne filed his complaint in superior court on August 18. In a brief minute entry, the trial court denied the requested injunctive relief and dismissed the complaint.

¶4　　　　The court of appeals found that, although Arizona's election laws appeared to impose the same filing deadline for all types of candidates, for practical purposes the deadlines were quite different and more restrictive for independent candidates than for political party candidates. Moreover, the statutes tied the deadline for independent candidates to party primary elections even though such candidates do not participate in them. Applying the analytical framework laid out by the United States Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564 (1983), the court of appeals found that the June 14 deadline imposed a "suspect burden" on the rights of voters by treating independent candidates in a manner that was both dissimilar and more burdensome than party candidates. *Browne,* 200 Ariz. at 265, 25 P.3d at 753, ¶ 18. The court then found that the State had advanced no "substantial reasons" justifying the June 14 deadline and therefore concluded that the resulting burden on the rights of independent voters was impermissible under the First Amendment. *Id.* at 266, 25 P.3d at 754, ¶ 24.

**ANALYSIS**

¶5        Arizona's election laws create four different procedures by which a candidate may have his or her name placed on the general election ballot:  1) as a candidate of a "new" political party, A.R.S. §§ 16-311, 16-801, 16-803; 2) as a candidate of a previously recognized political party, *Id.* §§ 16-311, 16-804; 3) as an independent candidate, *Id.* §§ 16-311, 16-341; or 4) as a write-in candidate, *Id.* § 16-312.  In all cases except write-in candidacies, candidates must file nomination papers not less than 90 days before the primary election. *Id.* § 16-311(A)-(B).  In 2000, that date was June 14.  Write-in candidates must file their nomination papers not less than fourteen days before the general election. *Id.* § 16-312(B).

¶6        In presidential contests, the nomination paper is filed not by a specific candidate, but rather by a slate of presidential electors.  *Id.* §§ 16-311(E), 16-341(G).  The statutes do not establish a deadline for notifying the Secretary of State of the identity of a political party's presidential candidate.  The record indicates that the state party chairman customarily provides this information by letter after the parties have completed their nominating conventions in July or August.  On the other hand, electors supporting an independent candidate must file a nomination petition for that candidate, signed by three percent of qualified electors not registered as members of a recognized political party, at the same time their nomination paper is filed.  *Id.* § 16-341(E).  The practical effect of the statutes, then, is to create a deadline for identifying independent presidential candidates one to two months earlier than that for political party candidates.

¶7        In *Anderson,* a case involving similar facts, the Supreme Court acknowledged that, in varying degrees, state election laws burden two basic First Amendment rights:  "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."  460 U.S. at 787, 103 S.Ct.

4

at 1570 (quoting *Williams v. Rhodes*, 393 U.S. 23, 30-31, 89 S.Ct. 5, 10 (1968)).  The Court also recognized the State's interest in ensuring fair, orderly and honest elections, and observed that, notwithstanding the impact on the right to vote and to associate, that interest is "generally sufficient to justify reasonable, nondiscriminatory restrictions."  *Id.* at 788, 103 S.Ct. at 1570.

> Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions.   Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation.  It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.  Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.  The results of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made."

*Id.* at 789-90, 103 S.Ct. at 1570 (citations omitted).

¶8        The Ohio statute before the Court in *Anderson* imposed a March 20 filing deadline on independent candidates, 75 days before the June primary election and 229 days before the general election.  Because this deadline occurred four to five months before the major political parties had identified their candidates and solidified their platforms, the Court found that it imposed an unequal burden on independent candidates, impinged on voters' associational choices and discriminated against candidates and voters outside the existing political parties.  The Court further found that, in the context of a presidential election, the deadline imposed a significant restriction on the nationwide electoral process.  *Id.* at 793-95, 103 S.Ct. at 1572-73.  In support of the March deadline, the State asserted its interest in allowing sufficient time for voter education, treating all candidates alike, and

5

ensuring political stability. While acknowledging the legitimacy of these interests, the Court found them to be "minimal" in comparison to the burdens resulting from the early deadline. *Id.* at 806, 103 S.Ct. at 1579. Accordingly, the Court held the statutory deadline unconstitutional.

¶9        Although the court of appeals acknowledged the differences between the Ohio statute and Arizona's election laws, it found that those differences were not significant and did not warrant a different conclusion as to the degree of burden imposed on the rights of independent voters. We disagree, for several reasons. First, the filing deadline in Arizona is 83 days closer to the general election than the Ohio deadline in *Anderson*, a significant difference in and of itself. The period between the deadline and the election is further abbreviated by Arizona's early ballot law, A.R.S. § 16-545, which requires that ballots be available for mailing to voters who request them 33 days prior to the general election. The effective period between the filing deadline and the election is thus 113 days.

¶10       Second, the national political process has evolved toward a system of ever-earlier presidential primary elections with the result that, by the middle of June in an election year, the identities and positions of the major party candidates have largely been determined. Thus, the concern in *Anderson* that independent voters disaffected from existing political parties would not have sufficient time to coalesce into viable groups is not present here. That concern is even less significant in this case given the nature of Browne's candidacy. Until at least June 14, he was a member of the Libertarian Party seeking nomination as that party's candidate to represent the views of that party's members. It is only because he lost the internal party dispute – and not in response to events transpiring within the major political parties – that he even sought to run as an independent candidate.

6

¶11     It is apparent, therefore, that Browne's exclusion from the ballot resulted not from a filing deadline that discriminated against independents but rather from his failed attempt to be nominated by his party. And nowhere does it appear that the views he espoused or the voters he purported to represent were other than those of the Libertarian Party, which were already represented by the successful slate of Libertarian electors. Thus there has been no showing that, as a result of the filing deadline, voters were deprived of either the right to associate to advance their political beliefs or the right to cast their votes effectively.[2] *See Anderson,* 460 U.S. at 787, 103 S.Ct. at 1569 ("[V]oters can assert their preferences only through candidates or parties or both."). Accordingly, we conclude that the court of appeals erred in finding that the June 14 filing deadline created a "suspect burden" on the rights of independent voters.

¶12     We therefore examine the Secretary's justification for the deadline. The Secretary advanced a number of reasons in support of the June deadline that are largely administrative in nature. They include the need to prepare early ballots, sample ballots and ballots for overseas voters not later than 33 days before the date of the general election; the increase in ballot preparation and printing time resulting from the use of optical scan ballots, and the need for adequate time to complete administrative and judicial review of election challenges. Because the Secretary conceded at oral argument before the court of appeals that she did not need the entire 146 days between the filing deadline and the general election to complete her responsibilities, and the record did not support a finding that that period of time was necessary, the court of appeals concluded that the Secretary had not articulated substantial reasons for the burden on the rights of independent voters resulting from the deadline.

---

[2] To the contrary, the record shows that three independent candidates appeared on the 2000 general election ballot, including one running for the office of United States Senator, notwithstanding the June 14 deadline.

7

**¶13** In light of our finding that the deadline does not impose a suspect or severe burden on the rights of independent voters, we are not required to subject the State's election scheme to a heightened degree of scrutiny, as the court of appeals did. *See Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059 (1992). We look instead to determine whether the restrictions imposed are reasonable and nondiscriminatory. *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1570. Applying this standard of review does not mean that this legislative choice can be justified only if it allows the Secretary the minimum period required for completing her duties. Rather, the deadline must be rationally related to the State's important regulatory interests. The Court in *Anderson* found that 75 days "appears to be a reasonable time for processing the documents submitted by candidates and preparing the ballot." *Id.* at 800, 103 S.Ct. at 1576. The United States District Court for Arizona has found that Arizona's prior filing deadline of June 27 did not, by itself, constitute an impermissible burden on the rights of independent voters. *Campbell v. Hull*, 73 F.Supp.2d 1081 (D. Ariz. 1999). Since that decision, the Legislature established an earlier deadline by fifteen days, but also enacted the early voting law, with the result that the current deadline is effectively earlier than the one upheld in *Campbell*, or 113 days before the ballot must be complete.

**¶14** The Secretary presented evidence that this period of time was necessary to complete election challenge proceedings and then prepare and print the final ballot. Separate ballots must be prepared for each political subdivision in the state, including not only federal and state candidates and measures but also the candidates and measures for individual counties, cities, towns, and districts. Ballot forms cannot be formatted for printing until it is known how many sets of presidential electors will be placed on the ballot. In the event of a challenge to the nominating petitions, the Secretary will not know whether space for an independent candidate's electors should be included on the ballot until the administrative and judicial proceedings are completed. Although

8

the applicable statute contemplates that this will occur within 25 days plus time for a "prompt" decision by this court, A.R.S. § 16-351(A), we can take judicial notice of our own records to find that these cases do not always reach this court within 25 days, and that ample time for a "prompt" decision often means more than a few days. Indeed, it was precisely because the law did not allow sufficient time to complete the challenge process as a practical matter that the Legislature moved the deadline back an additional 15 days in 1999. 1999 Ariz. Sess. Laws ch. 166, § 1. Finally, the completed ballots must be translated into numerous Native American languages in order to comply with the Voting Rights Act. 42 U.S.C. §§ 1973 *et seq.* While the Secretary may not need the entire period of time allowed under § 16-351 to complete her duties in every election year, additional time clearly is necessary when electoral challenges and related court proceedings occur. The time frame created by the Legislature is rationally related to the State's legitimate interest in ensuring an orderly resolution of those challenges before the deadline for composing, printing and distributing the final ballots.

## CONCLUSION

¶15 For the foregoing reasons, we hold that the filing deadline imposed by A.R.S. § 16-341 does not impermissibly burden the association rights of independent voters. The opinion of the court of appeals is vacated and the trial court's order is affirmed. Each side will bear its own costs and attorneys' fees.

_____
PATRICIA G. ESCHER, Judge*

9

CONCURRING:


_____
CHARLES E. JONES, Chief Justice


_____
RUTH V. McGREGOR, Vice Chief Justice


_____
STANLEY G. FELDMAN, Justice


_____
THOMAS A. ZLAKET, Justice (retired)


*Due to a vacancy on the court, pursuant to article VI, § 3 of the Arizona Constitution, the Honorable Patricia G. Escher, Judge of the Superior Court in Pima County, was designated to sit on this case.