IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————

**ARIZONANS FOR SECOND CHANCES, REHABILITATION, AND PUBLIC SAFETY (SPONSORED BY ASJ ACTION FUND); SMART AND SAFE ARIZONA; INVEST IN EDUCATION (SPONSORED BY AEA AND STAND FOR CHILDREN); AND SAVE OUR SCHOOLS ARIZONA,**
*Petitioners,*

*V.*

**KATIE HOBBS, IN HER OFFICIAL CAPACITY AS ARIZONA SECRETARY OF STATE,**
*Respondent.*

———————

No. CV-20-0098-SA
Filed September 4, 2020

———————

Special Action
**JURISDICTION ACCEPTED; RELIEF DENIED**

———————

COUNSEL:

Roopali H. Desai, D. Andrew Gaona, Kristen Yost, Coppersmith Brockelman PLC, Phoenix, Attorneys for Arizonans for Second Chances, Rehabilitation, and Public Safety, Smart and Safe Arizona, Invest in Education, and Save our Schools Arizona

Roy Herrera, Daniel A. Arellano, Ballard Spahr LLP, Phoenix, Attorneys for Katie Hobbs in her official capacity as Arizona Secretary of State

Mark Brnovich, Attorney General, Joseph A. Kanefield, Chief Deputy & Chief of Staff, Brunn (Beau) W. Roysden, III, Division Chief, Drew C. Ensign, Deputy Solicitor General, Jennifer J. Wright, Anthony R. Napolitano, Robert J. Maker, Assistant Attorneys General, Phoenix, Attorneys for Intervenor Mark Brnovich

David J. Cantelme, D. Aaron Brown, Cantelme & Brown, P.L.C., Tempe, Attorneys for Intervenors Speaker of the Arizona House of Representatives and President of the Arizona Senate

Timothy Sandefur, Christina Sandefur, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix, Attorneys for Amicus Curiae Goldwater Institute

Timothy A. LaSota, Timothy A. LaSota PLC, Phoenix, Attorneys for Amicus Curiae Arizona Free Enterprise Club

Daniel J. Adelman, Arizona Center for Law in the Public Interest, Spencer G. Scharff, Scharff PLLC, Phoenix, Attorneys for Amicus Curiae Professional Fire Fighters of Arizona, Will Humble, and Bradley J. Cohen, et. al.

Dennis Wilenchik, Lee Miller, John D. (Jack) Wilenchik, Wilenchik & Bartness PC, Phoenix, Attorneys for Amicus Curiae Arizona Republican Party

Paul F. Eckstein, Austin C. Yost, Perkins Coie LLP, Phoenix, Attorneys for Amicus Curiae Paul Bender

Shawn K. Aiken, Shawn Aiken PLLC, Phoenix, Attorneys for Amicus Curiae Hon. Kate Gallego, in her official capacity as Mayor, City of Phoenix, Hon. Coral Evans, in her official capacity as Mayor, City of Flagstaff, and Hon. Regina Romero, in her official capacity as Mayor, City of Tucson

Lisette Flores, Arizona State Senate, Rhonda L. Barnes, Jane Ahern, Arizona House of Representatives, Phoenix, Attorneys for Amicus Curiae Senate Minority Leader David Bradley and House Minority Leader Charlene Fernandez

———————

JUSTICE GOULD authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL, and JUSTICES LOPEZ, BEENE, and MONTGOMERY joined. JUSTICE LOPEZ, joined by JUSTICE MONTGOMERY, filed a concurring opinion. VICE CHIEF JUSTICE TIMMER concurred in Parts II and III and dissented as to Parts IV–VII. JUSTICE BOLICK dissented from the grant of jurisdiction.

———————

GOULD, J., opinion of the Court:

¶1	Article 4, part 1, section 1(9) of the Arizona Constitution ("Section 1(9)") outlines a specific procedure for collecting and verifying initiative petition signatures:

> [E]very sheet of every such petition containing signatures shall be verified by the affidavit of the person *who circulated said sheet* or petition, setting forth that each of the names on said sheet was *signed in the presence of the affiant* and that in the belief of the affiant each *signer* was a qualified elector of the state, or in the case of a city, town, or county measure, of the city, town, or county affected by the measure so proposed to be initiated or referred to the people. (Emphasis added.)

¶2	This constitutional provision, by its terms, requires initiative signatures to be collected in person on physical sheets of paper. However, Petitioners ask us, in the face of the current Coronavirus Disease ("COVID-19") pandemic, to eliminate Section 1(9)'s procedure and replace it with E-Qual, the Secretary of State's online signature gathering system. On May 13, 2020, we issued an Order ("May 13 Order") denying Petitioners' request. This Opinion explains the basis for that Order.

¶3	We hold that the Secretary of State ("Secretary") may not accept or file initiative signatures submitted through E-Qual because it does not comply with Section 1(9)'s in-person procedure for gathering and verifying such signatures. We also hold that Section 1(9) does not, as applied to Petitioners during the COVID-19 pandemic, violate their rights under article 4 of the Arizona Constitution, the First and Fourteenth Amendments to the United States Constitution, or the Arizona

Constitution's guarantees of equal protection, due process, and free speech. Despite the current limitations on social interactions caused by COVID-19, Section 1(9)'s in-person procedure does not prevent a reasonably diligent initiative proponent from gaining access to the ballot. As a result, Section 1(9) does not impose a severe burden on Petitioners' voting rights and is justified by the state's important regulatory interest in protecting the integrity of initiative elections.

¶4 Further, we hold that Section 1(9) does not unconstitutionally impinge upon Petitioners' free speech right to engage in one-on-one communications with eligible voters. Any limitations on such interactive communications are caused by the virus, and not Section 1(9). Indeed, in contrast to E-Qual's remote signature-gathering system, Section 1(9)'s in-person requirement is designed to *facilitate* in-person communications between circulators and potential signers, not limit them.

¶5 Finally, we hold that even if Section 1(9) imposes a severe burden on Petitioners' constitutional rights, it survives strict scrutiny. Section 1(9) advances the state's compelling interest in protecting the integrity of initiative elections, and E-Qual does not provide a viable alternative to Section 1(9)'s signature verification procedure.

¶6 At the time we issued our May 13 Order, we concluded that despite the onset of COVID-19, Petitioners could, by exercising reasonable diligence, comply with Section 1(9) and gain a place on the ballot. When Petitioners filed their special action, they had approximately four months to collect signatures before the July 2 filing deadline. Respondents claimed that Petitioners could safely collect in-person signatures during this period. In response, Petitioners argued that such collection efforts were "a practical impossibility." In short, rather than presenting evidence of their diligent efforts to comply with Section 1(9), they simply advised us that without access to E-Qual, their "signature gathering will halt." We disagreed.

¶7 COVID-19 did not eliminate face-to-face political activity in this country. And although recent developments do not provide a justification for our May 13 Order, the fact is that despite not having the use of E-Qual, three of the four Petitioners were able to collect enough signatures to satisfy the minimum signature requirement. Indeed, Petitioners were able to collect *hundreds of thousands* of signatures *after* the onset of the virus.

¶8        Our decision today protects the people's right to legislate by initiative. The framers of our Constitution never sought to guarantee every initiative, including erroneous and fraudulent measures, a place on the ballot. Rather, as part and parcel of the initiative right, they adopted Section 1(9) to protect the integrity of initiative elections by ensuring that only *valid* initiatives made it on the ballot. The cornerstone of this protection is Section 1(9)'s requirement that circulators personally witness every signature made on a petition sheet.

¶9        But our decision preserves far more than the right to legislate by initiative. The people of this state look to us to uphold the law, and we must act consistently with that imperative. Petitioners claim that COVID-19 makes it necessary, this *one time*, to set aside Section 1(9). But they fail to see the long-term damage such a decision would cause to our system. Applying a rule of necessity here, we would justify setting aside other laws and constitutional protections whenever a crisis or emergency arises. Indeed, if COVID-19 justifies setting aside Section 1(9) today, then perhaps tomorrow it will be used to set aside other constitutional protections. In short, our decision would lie "about like a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need." *Korematsu v. United States*, 323 U.S. 214, 246 (1944) (Jackson, J., dissenting).

¶10        We do not suggest that Section 1(9)'s verification procedure is the best or only means to protect the integrity of the initiative process. Indeed, perhaps Petitioners are correct in asserting that even absent COVID-19, they, like candidates, should have had "access to E-Qual from the get-go." But Section 1(9) is the law and we will not re-write the Constitution in the middle of an election simply because some find it "too inconvenient for present-day operation." *W. Devcor, Inc. v. City of Scottsdale*, 168 Ariz. 426, 432 (1991). If the people of Arizona believe Section 1(9) is outdated, it is their right, if they wish, to amend it.

¶11        We sometimes forget the sacrifices it took to create and preserve a nation based on the rule of law. It is easy to take for granted. And lest we forget, the people who established this system faced emergencies too. But they understood the dangers posed by governing by necessity, especially in times of crisis. We should respect and embrace their wisdom.

## I.

¶12      The Petitioners are four political action committees ("PACs") seeking to place statutory initiatives on the November 2020 ballot. They are: (1) Second Chances, Rehabilitation, and Public Safety ("Second Chances"); (2) Invest in Education; (3) Smart and Safe Arizona; and (4) Save Our Schools Arizona ("SOSAZ"). Second Chances, Invest in Education, and SOSAZ filed their initiative applications and began gathering petition signatures between February 18 and February 26, 2020. *See* A.R.S. § -111(A) (stating that before a PAC can begin collecting signatures it must file an application with the Secretary). As of April 1, the date Petitioners filed their special action, Second Chances had gathered 66,000 signatures, while Invest in Education and SOSAZ had gathered 85,000 and 50,000 signatures, respectively. In contrast, Smart and Safe Arizona filed its application on September 26, 2019 and, by April 1, 2020, had gathered 300,000 signatures, surpassing the constitutionally required minimum to qualify for the ballot. *See* Ariz. Const. art. 4, pt. 1, §§ 1(2), (7) (providing statutory initiatives must be signed by ten percent of the votes cast for governor in the most recent election to qualify for the ballot); *Initiative Referendum and Recall*, Ariz. Sec'y of State, https://azsos.gov/elections/initiative-referendum-and-recall (last visited Aug. 12, 2020) (stating that, to qualify for the November 2020 ballot, initiative proponents must collect 237,645 signatures by July 2, 2020).[1]

¶13      Beginning in March 2020, face-to-face communications and large public events were understood to facilitate the spread of COVID-19, and "social distancing" entered our lexicon. As a result, the Governor issued an executive order on March 30 suspending non-essential in-person activities. Executive Order 2020-18 (Mar. 30, 2020) ("Stay-at-Home Order"). The Stay-at-Home Order did not apply to "constitutionally protected activities," such as petition circulation efforts, but its restrictions made contacting potential signers more difficult. *Id.* The Stay-at-Home Order remained in effect until May 16, 2020. *Id.*; Executive Order 2020-36 (May 12, 2020) (lifting order).[2]

---

[1] We may take judicial notice of the Secretary's website. *Pedersen*, 230 Ariz. at 559 ¶ 15 (citing Ariz. R. Evid. 201(b), (b)(2) (permitting court to take judicial notice from sources whose accuracy cannot reasonably be questioned)).

[2] On June 29, the Governor re-imposed some restrictions, including temporarily closing bars, gyms, and movie theaters. Executive Order 2020-43 (June 29, 2020).

¶14         Faced with the unexpected difficulties of collecting in-person signatures during COVID-19, Petitioners filed this special action. As relief, Petitioners asked this Court to direct the Secretary to: (1) allow them to use E-Qual; and (2) accept and file signatures obtained using that system.

## II.

## A. Jurisdiction

¶15         Rule 3 of the Arizona Rules of Procedure for Special Actions states that "only" certain "questions may be raised in a special action." Here, State Intervenors argue that we lack jurisdiction because Petitioners have failed to specifically allege any of these "questions." However, we conclude that because Petitioners have sufficiently alleged a mandamus action, and our jurisdiction to issue writs of mandamus derives from the Arizona Constitution, we have jurisdiction.

¶16         "An action is in the nature of mandamus if it seeks to compel a public official to perform a non-discretionary duty imposed by law." *Stagecoach Trails MHC, L.L.C. v. City of Benson*, 231 Ariz. 366, 370 ¶ 19 (2013). We have original jurisdiction to issue writs of mandamus and "exercise this jurisdiction through the special action procedure." Ariz. Const. art. 6, § 5(1); *Fairness & Accountability in Ins. Reform v. Greene*, 180 Ariz. 582, 584 n.1 (1994) ("[S]pecial action relief is the modern equivalent of [a] common law writ[] such as mandamus. . . ."). Rule 3(a) "sets forth the traditional functions of the writ of mandamus" by permitting petitioners to compel a state officer to perform a duty required by law. Ariz. R.P. Spec. Act. 3(a) State Bar Committee Note (a).

¶17         Here, Petitioners do not provide a textbook example of how to allege a mandamus action. Jurisdictional statements are important, particularly when a party is seeking special action relief. But here, Petitioners neither cite Rule 3(a), nor do they provide a clear and concise statement addressing our jurisdiction in this case. We caution parties to avoid this practice in the future.

¶18         Nevertheless, reading Petitioners' briefs as a whole, we conclude that they have properly alleged a mandamus action. Specifically, throughout their briefs, Petitioners assert that the Secretary has refused to perform her constitutional duty to accept and file E-Qual petitions, and that

this Court should order her to perform that constitutional duty.[3] *See* A.R.S. § 19-122(A) (stating that a party may bring a writ of mandamus to compel the Secretary to "accept and file" initiative petitions); *Adams v. Bolin*, 77 Ariz. 316, 323 (1954) (addressing whether to grant mandamus to compel the Secretary to accept a candidate's nomination petition based on the Secretary's legal obligation to do so); *see also* Ariz. R.P. Spec. Act. 2(a)(1) (stating that "[a]ny person who previously could institute an application for a writ of mandamus" prior to the adoption of the special action rules "may institute proceedings for a special action").

**¶19**    Additionally, the fact that we must resolve whether the Secretary is constitutionally required to accept such petitions does not, as State Intervenors contend, deprive this Court of jurisdiction.  Rather, one purpose of a mandamus action is to determine the extent of a state official's legal duties.  *See Pedersen v. Bennett*, 230 Ariz. 556, 558 ¶ 5, 560 ¶¶ 18, 21 (2012) (determining, in the context of a mandamus action and assessing reasonableness of attorney fees under A.R.S. § 12-2030(A), the scope of the Secretary's legal duty to accept and file initiative petitions).

**¶20**    Other factors also support accepting special action jurisdiction here.  This case involves primarily a legal issue of constitutional, statewide importance.  *See Dobson v. State ex rel., Comm'n on App. Ct. Appointments*, 233 Ariz. 119, 121 ¶ 7 (2013) (finding special action

---

[3] For example, Petitioners request "this Court to exercise its original and special action jurisdiction and order the Secretary to permit them to gather initiative petition signatures through E-Qual."  Petitioners claim that "[t]his result is required by Article IV, principles of equal protection[,] and due process, and the [Petitioners'] right to free speech."   Similarly, Petitioners assert that "to protect their rights under Article IV," they "request that this Court . . . order[] the Secretary to allow them to collect initiative petition signatures . . . through E-Qual[] and . . . enjoin[] the Secretary from enforcing any provision of Arizona law that would preclude [Petitioners'] use of E-Qual."  Petitioners also expressly cite our "original jurisdiction over mandamus, injunction[,] and other extraordinary writs to state officers," as grounds to order the Secretary to provide them access to E-Qual, claiming that if she fails to provide such access "in violation of their constitutional rights," "she has either failed to perform a required legal duty or has abused her discretion."   As yet another example, Petitioners "request that this Court . . .  order[] the Secretary to allow them to collect initiative petition signatures and . . . enjoin[] the enforcement of any provision of Arizona law that would preclude [their] use of E-Qual."

jurisdiction was appropriate to address legal questions of statewide importance requiring constitutional interpretation). And, at the time Petitioners filed their special action, there was a need for immediate, final relief, given the fact that the July 2 deadline for submitting initiative petitions was rapidly approaching. *See Dobson*, 233 Ariz. at 121–22 ¶ 8 (considering that immediate, final resolution was necessary to provide relief); *Smoker v. Bolin*, 85 Ariz. 171, 172 (1958) (considering whether to grant mandamus against the Secretary where "time was of the essence and the matters involved were of great public interest"). Finally, this case presents a legal issue where most of the key facts, such as the dates Petitioners started collecting signatures and the number of signatures they have gathered, are not in dispute. *See supra* ¶¶ 12–13. *See Dobson*, 233 Ariz. at 121 ¶ 7 (granting special action jurisdiction where some facts were disputed, but the resolution did not turn on disputed facts); *Brewer v. Burns*, 222 Ariz. 234, 237 ¶¶ 8–9 (2009) (granting special action jurisdiction and noting that the relevant facts were undisputed even though one party claimed "intense fact questions").

## B. Standing

**¶21** State Intervenors also claim that Petitioners lack standing. Specifically, they claim that Petitioners' alleged injury—potential denial of access to the ballot due to difficulty collecting signatures—is caused by COVID-19 and not the Secretary's refusal to accept E-Qual petitions. Second, they assert that the Secretary cannot redress Petitioners' purported injury because she lacks the constitutional and statutory authority to file E-Qual initiative petitions. We note that the Secretary does not contest Petitioners' standing. *See Rios v. Symington*, 172 Ariz. 3, 5 n.2 (1992) (declining to address standing in a special action involving constitutional issues of statewide importance where the parties failed to raise the issue). Nevertheless, because this case involves an issue of statewide importance, we address whether Petitioners have standing to bring this action.

**¶22** Unlike the Federal Constitution, Arizona's Constitution does not contain a specific case or controversy requirement. As a matter of judicial restraint, however, this Court has traditionally required a party to establish standing. *See, e.g.*, *Dobson*, 233 Ariz. at 122 ¶ 9 ("[S]tanding is not jurisdictional, but instead is a prudential doctrine."); *Bennett v. Napolitano*, 206 Ariz. 520, 524 ¶ 16, 529 ¶ 41 (2003) (declining review on the merits for lack of standing). And, despite differences between federal and state standing requirements, we "have previously found federal case law instructive." *Bennett*, 206 Ariz. at 525 ¶ 22; *see also Dobson*, 233 Ariz. at 122

¶ 9 ("[T]his Court is informed, but not bound, by federal standing jurisprudence.").

**¶23**　　　To establish standing, a party must first establish "a causal nexus between the defendant's conduct and [their] injury." *Rothstein v. UBS AG*, 708 F.3d 82, 91–92 (2d Cir. 2013) (quoting *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992)); *see Bennett*, 206 Ariz. at 525 ¶ 18 (2003) (stating that "[t]o establish federal standing, a party invoking the Court's jurisdiction 'must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct . . . .'" (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984))). This requirement is a low bar and "easily shown if there is a direct relationship between the plaintiff and the defendant with respect to the conduct at issue." *Rothstein*, 708 F.3d at 91; *see Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1255 (N.D. Fla. 2016) (finding standing to sue the Florida Secretary of State for an extension of the voter registration deadline where the Secretary, as chief election officer, had the power to order compliance with the state election code and "'his office sufficiently connect[ed] him with the duty of enforcing' the election laws" (quoting *Ex Parte Young*, 209 U.S. 123, 161 (1908))).

**¶24**　　　Petitioners' alleged injury is fairly traceable to the Secretary. The Secretary is the only state officer capable of providing access to E-Qual and filing initiative petitions obtained using that system. *See Infra* ¶31; Ariz. Const. art. 4, pt. 1, § 1(4), (9) (stating that "[a]ll petitions submitted under the power of initiative . . . *shall* be filed with the [S]ecretary" and "[e]very initiative . . . petition *shall* be addressed to the [S]ecretary" (emphasis added)). However, according to Petitioners, by refusing to perform her constitutional duty and accept E-Qual petitions, the Secretary has, in the face of COVID-19, made it impossible for them to qualify for the 2020 ballot. *Supra* ¶18; *see Browne v. Bayless*, 202 Ariz. 405, 406 ¶ 1 (2002) (affirming the trial court's finding of standing to sue the Secretary of State where a statute required the Secretary to reject candidates' nomination papers, but the constitutionality of the statute was at issue).

**¶25**　　　Federal standing also requires the injury be redressable. Specifically, a party must show that their requested relief would alleviate their alleged injury. *Bennett*, 206 Ariz. at 525 ¶ 18. This is a relaxed burden, and the remedy need not completely cure the alleged harm. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 525–26 (2007) (finding redressability because the requested remedy of ordering the EPA to regulate vehicle emissions would have some effect on the harms caused by global warming).

¶26         Petitioners' injury is redressable.  Specifically, Petitioners claim that if we direct the Secretary to perform her constitutional duty and accept E-Qual petitions, they will be able to collect electronic signatures during COVID-19 and gain access to the ballot.

## III.

¶27         Petitioners initially argue that Section 1(9) does not require in-person signatures on initiative petitions.  As a result, they claim the Secretary must accept and file signatures collected through E-Qual.  Alternatively, Petitioners argue that because E-Qual substantially complies with Section 1(9)'s in-person requirement, the Secretary must accept E-Qual signatures.

¶28         We review de novo the "interpretation and application of constitutional and statutory provisions regarding initiatives." *Molera v. Reagan*, 245 Ariz. 291, 294 ¶ 8 (2018).  Where unambiguous, we apply the express terms of a constitutional or statutory provision without resorting to secondary methods of construction. *See Heath v. Kiger*, 217 Ariz. 492, 494 ¶ 6 (2008); *Kromko v. Superior Court*, 168 Ariz. 51, 57–58 (1991).  Further, we give meaning to "each word, phrase, and sentence . . . so that no part will be void [sic], inert, redundant, or trivial." *City of Phoenix v. Yates*, 69 Ariz. 68, 72 (1949).

### A.  Requirements of Section 1(9)

¶29         The Arizona Constitution sets forth two primary requirements for collecting and verifying initiative petition signatures.  First, circulators must personally witness every signature made on a petition sheet.  Specifically, Section 1(9) requires every person signing a petition "sheet" (the "signer") to do so "in the presence" of the "affiant" circulating the petition.  Ariz. Const. art. 4, pt. 1 § 1(9) (emphasis added); *see* A.R.S. § 19-112(A) (requiring petitions be signed in the presence of the person circulating the petition), -112(C) (requiring circulator avow to witnessing the signature before a notary public), -112(D) (requiring a circulator attach an affidavit swearing, under penalty of perjury, that the petition was signed in his or her presence).

¶30         Second, petitions must be signed on a physical sheet of paper.  Section 1(9) states that signatures must be made on a "sheet."  To determine the drafters' intent regarding the word "sheet," we consider the meaning of the word when the Constitution was adopted in 1912. *See* Antonin Scalia &

Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012) ("Words must be given the meaning they had when the text was adopted."). "Sheet," at the time the framer's drafted the Constitution, could only mean a sheet of paper. *See, e.g.*, Webster's Common School Dictionary (1892) (defining "sheet" as "a broad piece of paper"); Judicial and Statutory Words and Phrases (1905) (setting forth same).

**¶31** In contrast to Section 1(9)'s detailed procedure for verifying initiative petition signatures, the Constitution does not prescribe any procedure for verifying signatures on candidate nominating petitions. Rather, the legislature has plenary power to prescribe such nominating procedures for candidates. *See* Ariz. Const. art. 7, § 10 ("The Legislature shall enact . . . law[s] . . . provid[ing] for the nomination of candidates."); *Cavender v. Bd. of Supervisors of Pima Cty.*, 85 Ariz. 156, 160 (1958) (stating that the legislature has plenary authority to prescribe nominating procedures for candidates). Pursuant to this plenary power, the legislature authorized the Secretary to create E-Qual. *See* A.R.S. §§ 16-316(A) (stating that the Secretary may create a system that allows "qualified electors" to sign candidate nominating petitions for state legislative offices "by way of a secure internet portal"), -317(A) (setting forth same for municipal and county offices), -318(A) (setting forth same for federal offices).

**¶32** E-Qual permits candidates to circulate their petitions online. To "sign," individuals may click on a weblink and provide their name, date of birth, and either their driver license number or voter registration number, and the last four digits of their social security number. E-Qual software then connects to the Secretary's Arizona Voter Information Database ("AVID") and electronically verifies that the person is eligible to sign the petition. According to the Secretary, when candidates have collected the requisite signatures, they "simply close out the E-Qual petition" and "the system . . . generate[s] a coversheet and PDF list or CSV file" containing the name, address, date of signing, and voter identification number of each signer. The candidate then prints the petitions, signs a "circulator statement," and files the petitions and statement with the Secretary.

**¶33** E-Qual's signature verification procedure is different from, and does not comply with, Section 1(9)'s procedure. Although Section 1(9) requires a circulator to collect and verify signatures in person, E-Qual does not. Rather, E-Qual collects and verifies signatures remotely using an online portal. Additionally, Section 1(9) directs that signatures be provided on paper, while E-Qual signatures are provided electronically.

¶34 Nevertheless, Petitioners claim that E-Qual can comply with Section 1(9) if "signers" attest to and authenticate their own signatures. Specifically, they assert that a person "signing" an E-Qual petition can also act as the "affiant" by avowing that he signed the petition on his own behalf in his "own presence." We disagree with this strained and confusing construction of Section 1(9). Nothing in Section 1(9) suggests that a signer and affiant can be the same person. Section 1(9) describes two separately named persons: (1) the "affiant," who circulates petitions and verifies signatures; and (2) the "signer," who signs the petition. By giving the "affiant" and "signer" separate names and different functions, the framers made it clear that the signer and affiant are two distinct people. *See City of Mesa v. Salt River Project Agric. Improvement & Power Dist.*, 92 Ariz. 91, 102 (1962) (declining to read different terms to have the same meaning).

¶35 Petitioners also urge that, because electronic signatures have become "realities of modern life," we should adopt a "practical approach" by construing Section 1(9) to allow for electronic signatures. We agree that technology has drastically changed since Section 1(9) was adopted in 1912, but technological advancement and common practice do not justify rewriting the text of the Constitution. *See W. Devcor, Inc.*, 168 Ariz. at 432 (refusing to "read[] out of existence" Section 1(9)'s circulator-verification requirement that "the framers saw fit to include" and replace it with a verification by city clerks).

## B. Substantial Compliance

¶36 Next, Petitioners argue that E-Qual substantially complies with Section 1(9). We note that Petitioners waived this argument by failing to raise it in their opening brief. *See United Bank v. Mesa N. O. Nelson Co.*, 121 Ariz. 438, 443 (1979) (providing that we need not address issues raised for the first time in a reply). Nevertheless, because it involves an issue of statewide importance, we address it.

¶37 Substantial compliance applies to petitions that, despite minor, technical errors, still "fulfill[] the purpose of the relevant statutory or constitutional requirements." *Feldmeier v. Watson*, 211 Ariz. 444, 447 ¶ 14 (2005). Thus, a petition will be deemed valid if it "compl[ies] substantially, [but] not necessarily technically" with statutory and constitutional requirements. *State v. Osborn*, 16 Ariz. 247, 250 (1914) (citation omitted). In making this determination, we "consider several factors, including the nature of the constitutional . . . requirements, the extent to which the petitions differ from the requirements, and the purpose of the

requirements." *Feldmeier*, 211 Ariz. at 447 ¶ 14. *See also id.* at 449 ¶ 23 (finding substantial compliance where affidavit omitted the phrase "City of Prescott"); *Wilhelm v. Brewer*, 219 Ariz. 45, 49 ¶¶ 17–18 (2008) (determining substantial compliance despite capitalization errors); *Kromko*, 168 Ariz. at 57–58 (determining substantial compliance where extraneous short title was not required by the statute).

¶**38** Petitioners' claim fails. Section 1(9) provides a *different* procedure for collecting signatures than E-Qual. Thus, E-Qual does not comply, much less substantially comply with Section 1(9).[4]

## IV.

¶**39** Petitioners concede that absent the current circumstances involving COVID-19, Section 1(9) is a valid ballot restriction. As a result, they do not claim that Section 1(9) is facially unconstitutional. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (stating that a party claiming that a law is facially unconstitutional must "establish that no set of circumstances exists under which [the law] would be valid"). And Petitioners do not argue that the Stay-at-Home Order, as applied to them, violates their constitutional rights. Nor could they, because the Stay-at-Home Order exempts constitutionally protected activities such as collecting initiative signatures. Executive Order 2020-18 (Mar. 30, 2020).

¶**40** Rather, Petitioners argue that Section 1(9)'s in-person procedure, as applied to their efforts to collect initiative signatures during COVID-19, violates their fundamental right to vote, as well as their rights guaranteed by the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. *See Wis. Right to Life, Inc. v. FEC*, 546 U.S. 410, 411–12 (2006) (explaining that an as-applied attack argues that a law's application to a particular person under particular circumstances deprived that person of a constitutional right). Petitioners bear the burden of establishing that Section 1(9) violates their constitutional rights. *See Graham v. Tamburri*, 240 Ariz. 126, 130–31 ¶ 13 (2016); *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 730 (9th Cir. 2015).

---

[4] Because E-Qual does not substantially comply with Section 1(9), we need not address the constitutionality of A.R.S. § 19-102.01, which requires that initiatives strictly comply with statutory and constitutional requirements. *See Petolicchio v. Santa Cruz Cty. Fair & Rodeo Ass'n, Inc.*, 177 Ariz. 256, 259 (1994) (explaining that we do not reach constitutionality of a statute if "unnecessary in determining the merits of the action").

## A. Framework

¶41    Ballot access restrictions implicate the right to vote and the related right to associate with others to advance shared political beliefs. *See Moore v. Ogilvie*, 394 U.S. 814, 818 (1969) (stating that restrictions on candidate nominating petitions implicate the fundamental right to vote); *Williams v. Rhodes*, 393 U.S. 23, 31 (1968) (same). However, the right to place an initiative measure on the ballot is not absolute, *see Burdick v. Takushi*, 504 U.S. 428, 433 (1992), and "substantial regulation of elections" is necessary "if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Accordingly, states have "considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *Buckley v. Am. Const. L. Found., Inc.* ("*ACLF II*"), 525 U.S. 182, 191 (1999).

¶42    The United States Supreme Court has provided one framework for analyzing the constitutionality of all ballot access restrictions. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick*, 504 U.S. at 434. Under this framework, courts weigh the severity of the burden on a plaintiff's First and Fourteenth Amendment rights to determine the level of scrutiny to apply. *Burdick*, 504 U.S. at 434 (applying *Anderson*'s "more flexible standard" but refining it and clarifying that courts must weigh the constitutional burden before determining the level of scrutiny). Restrictions imposing a "severe burden" are subject to strict scrutiny and must be narrowly tailored to advance a compelling state interest. *Id.*; *Graham*, 240 Ariz. at 130 ¶ 12, 131 ¶ 19 (setting forth same). However, restrictions that "impose[] only 'reasonable, nondiscriminatory restrictions,'" trigger less exacting review. *Burdick*, 504 U.S. at 434 (quoting *Anderson,* 460 U.S. at 788). Such laws need not be narrowly tailored and may be justified by the state's "important regulatory interests." *Id.*; *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Graham*, 240 Ariz. at 130 ¶ 12; *Dudum v. Arntz*, 640 F.3d 1098, 1114 (9th Cir. 2011).

¶43    Petitioners claim, however, that instead of applying the *Anderson/Burdick* framework, we should apply the test set forth in *Turley v. Bolin*, 27 Ariz. App. 345, 348 (1976). We disagree. *Turley* applies to *statutes* that "unreasonably hinder or restrict" the right to legislate by initiative. *Id.* at 348. But here, Section 1(9) is a constitutional provision, not a statute, and it was adopted by the framers alongside the right to legislate by initiative. In short, *Turley* does not apply here.

## B. Burden

**¶44**         Although there is no "'litmus-paper test' that will separate valid from invalid [ballot] restrictions," *Anderson,* 460 U.S. at 789 (quoting *Storer*, 415 U.S. at 730), there have emerged two general categories of ballot access restrictions that impose severe burdens. A restriction may impose a severe burden if it: (1) discriminates by "operat[ing] as a mechanism to exclude certain classes" of "identifiable political group[s]" from the ballot, *see, e.g.*, *Anderson*, 460 U.S. at 793–94 (citation omitted); or (2) would prohibit even a reasonably diligent candidate/proponent from earning a place on the ballot. *Storer*, 415 U.S. at 742; *see Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 762–63 (9th Cir. 1994) (finding no severe burden where a reasonably diligent independent party could collect needed signatures within a deadline), *overruled on other grounds by Pub. Integrity Alliance, Inc. v. City of Tucson*, 836 F.3d 1019, 1025 (9th Cir. 2016); *Stone v. Bd. of Election Comm'rs*, 750 F.3d 678, 682 (7th Cir. 2014) (describing the reasonable diligence test as "[w]hat is ultimately important" to determine whether a severe burden exists); *Graham*, 240 Ariz. at 130 ¶ 13, 131 ¶ 14 (to the same effect).

### 1. Neutral and Non-Discriminatory

**¶45**         As an initial matter, Section 1(9) does not qualify as the first type of severe restriction because it does not discriminate against political groups. Rather, it is a neutral and non-discriminatory verification procedure that applies to all initiatives. *See Rubin v. City of Santa Monica*, 308 F.3d 1008, 1015 (9th Cir. 2002) (holding that there was no severe burden where a ballot restriction was applicable to all candidates); *see also Anderson*, 460 U.S. at 793 (explaining that it is "especially difficult for the [s]tate to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status"). Indeed, signature verification provisions such as Section 1(9) are generally considered to be neutral and nondiscriminatory. *Lemons v. Bradbury*, 538 F.3d 1098, 1105 (9th Cir. 2008) (stating that "[l]ike other evenhanded restrictions that protect the integrity and reliability of the electoral process itself, the state's signature verification procedures must be upheld" (citations omitted) (internal quotation marks omitted)); *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 297 (6th Cir. 1993) (holding that Michigan's procedures for determining whether initiative signatures are valid are "content-neutral, nondiscriminatory regulations that are . . . reasonably related to the purpose of administering an honest and fair initiative procedure").

## 2. Diligence

**¶46**      A proponent bears the burden of showing that he exercised reasonable diligence in seeking ballot access. *See Angle v. Miller*, 673 F.3d 1122, 1133–34 (9th Cir. 2012); *Citizens For Honest & Responsible Gov't v. Sec'y of State*, 11 P.3d 121, 125–26 (Nev. 2000). In assessing an initiative proponent's diligence, we examine whether current or past proponents subject to the same requirements have been able to secure a place on the ballot. *Storer*, 415 U.S. at 742; *Munro*, 31 F.3d at 763. Additionally, we examine a proponent's diligence in the context of the state's entire ballot access scheme, *see Williams*, 393 U.S. at 34, analyzing the impact that other laws, such as minimum signature requirements, limitations on the number of available signers, and the length of time to collect signatures, may have on a proponent's ability to qualify for the ballot. *See Mandel v. Bradley*, 432 U.S. 173, 178 (1977) (examining a candidate's diligence in the context of state laws regarding the number of required signatures, limitations on the available pool of signers, and the time period to obtain signatures); *Whittaker v. Mallott*, 259 F. Supp. 3d 1024, 1034 (D. Alaska 2017) (same); *Green Party of Ga. v. Kemp*, 106 F. Supp. 3d 1314, 1322–23 (N.D. Ga. 2015) (same).

**¶47**      Arizona's ballot access scheme does not prevent a reasonably diligent initiative proponent from gaining access to the ballot. As an initial matter, proponents have approximately twenty months to collect signatures. Courts generally have not found a severe burden when a proponent has such an extended period of time to collect signatures. *See Libertarian Party of Fla. v. Florida*, 710 F.2d 790, 794 (11th Cir. 1983) (finding no severe burden based, in part, on the fact that the candidate was afforded 188 days to collect signatures); *Kemp*, 106 F. Supp. 3d at 1322–23 (finding no severe burden where candidate had 180 days to collect signatures); *Libertarian Pol. Org. of Okla. v. Clingman*, 162 P.3d 948, 955 ¶ 21 (Okla. 2007) (finding no severe burden where minority political parties had one year to collect signatures).

**¶48**      Arizona also allows all eligible voters to sign initiative petitions, thereby creating a large pool of available voters to sign a proponent's petitions. *See, e.g.*, *Swanson v. Worley*, 490 F.3d 894, 904 (11th Cir. 2007) (holding that lack of restrictions on the available pool of potential signers, which encompassed all eligible voters, was a factor that "alleviat[ed]" a candidate's burden in gathering signatures). Additionally, Arizona's July 2 petition filing deadline is not unreasonably early. *Anderson*, 460 U.S. at 782, 792 (striking down a statutory filing deadline

requiring independent candidates to submit all signatures by March 20); *Whittaker*, 259 F. Supp. 3d at 1036 (providing that a mid-August deadline was not overly burdensome); *Campbell v. Hull*, 73 F. Supp. 2d 1081, 1087 (D. Ariz. 1999) (providing that a June 27 filing deadline was not overly burdensome); *Browne*, 202 Ariz. at 407 ¶ 5, 409 ¶ 13 (providing that a mid-June deadline was not unreasonably early).

¶49 Here, in the context of Arizona's laws, the record shows that Petitioners did not exercise reasonable diligence. Apart from Smart and Safe Arizona, Petitioners made no effort to collect signatures for sixteen months (November 2019 to February 2020). *See Dobson v. Dunlap*, 576 F. Supp. 2d 181, 191 (D. Me. 2008) (stating that "[t]he constitutional standard contemplates a reasonably diligent [initiative proponent] not a last-minute procrastinator"); *Clingman*, 162 P.3d at 950 ¶ 2, 954–55 ¶¶ 20–21 (finding no severe burden where minority political parties, despite the fact that they had one year to collect signatures, only collected half the necessary signatures, and made "little effort" to collect signatures until two months before the deadline); *cf. Burdick*, 504 U.S. at 436–37 (giving "little weight" to independent candidates' late decision to seek ballot access and noting that a burden on "'instantaneous access to the ballot'" was a "very limited one" (quoting *Storer*, 415 U.S. at 736)).

¶50 Perhaps more importantly, Smart and Safe Arizona, which began collecting signatures in September 2019, was able, by April 1, to collect the required signatures to qualify for the November 2020 ballot. *See Am. Party of Tex. v. White*, 415 U.S. 767, 787 (1974) (stating that "we are thus unimpressed with arguments that [ballot access] burdens . . . are too onerous . . . where two of the original party plaintiffs themselves satisfied these requirements"); *Prete v. Bradbury*, 438 F.3d 949, 967 (9th Cir. 2006) (finding no severe burden in part because another petition sponsor managed to comply with the subject regulation and obtain a place on the ballot); *Stone*, 750 F.3d at 682–83 (to the same effect).

¶51 Petitioners' only excuse for failing to collect signatures during this sixteen-month period is that it is "common practice" for initiative proponents to begin gathering signatures in the "spring" of an election year. In support of this purported justification, Petitioners cite three previous initiatives that qualified for the ballot after proponents began their collection efforts in the spring of the election year.

¶52 We are unpersuaded. From 2010–2018, 106 PACs filed applications to begin collecting initiative signatures. However, only sixteen

PACs filed their applications after March 1 of the election year. *See Voter Registration & Historical Election Data*, Ariz. Sec'y of State, https://azsos.gov/elections/voter-registration-historical-election-data (last visited Aug. 12, 2020). In short, waiting to gather signatures until the spring of an election year is not a common practice. Rather, Petitioners' delayed start is simply their preferred strategy to gain ballot access. However, "the Constitution does not require that [the state] compromise the policy choices embodied in its ballot-access requirements to accommodate [an initiative proponent's] strategy." *Timmons*, 520 U.S. at 365.

¶53     Petitioners argue, however, that their failure to collect signatures before the onset of COVID-19 is irrelevant. Rather, they claim that we must only examine their ability to collect signatures *after* the onset of COVID-19, e.g., from early March until July 2.

¶54     We reject Petitioners' argument. This Court must examine Petitioners' diligence throughout the full window of time available to them to gather signatures. *Supra* ¶¶ 46–47. This does not mean that Petitioners may only show their diligence through an early start date. However, it is also true that we are not required to ignore their failure to collect a single signature for almost sixteen months.

¶55     Petitioners have not shown they exercised reasonable diligence after the onset of COVID-19. *See infra* ¶¶ 60–61 (discussing cases where courts have considered the diligence of candidates and initiative proponents in attempting to gather signatures during COVID-19). Throughout this case, in response to their opponents' argument that collecting signatures during the pandemic was still feasible, Petitioners have taken the position that COVID-19 has "rendered signature gathering a practical impossibility." In short, rather than presenting evidence regarding their plans and efforts to gather signatures during the pandemic, they simply advised us that without access to E-Qual, their petition efforts were "near-impossible," and "signature gathering will halt."

¶56     We note that subsequent events have proved this claim to be untrue. Even without access to E-Qual, neither the Governor's orders nor COVID-19 prevented three of the four Petitioners from collecting the required number of signatures (237,645) by the July 2 deadline. Specifically, Second Chances filed petitions containing 338,202 signatures; Invest in Education filed 377,456 signatures; and Smart and Safe Arizona filed 415,587 signatures. Indeed, another initiative committee, "Stop Surprise

Billing and Protect Patients Act," was able to collect 385,771 signatures.[5] Only SOSAZ failed to file the minimum required signatures.

¶57 Finally, we note that, according to the dissent, our analysis focuses only on Petitioners' rights and fails to consider the "electorate's rights." Our colleague is mistaken. Given the close correlation between the rights of initiative proponents and the electorate, the *Anderson/Burdick* framework necessarily considers the burdens placed on both of them. *See Bullock v. Carter*, 405 U.S. 134, 143 (1972) (stating that the rights of candidates and voters do not easily lend themselves to "neat separation" because there is a correlative effect between them). Indeed, the petitioner in *Burdick was* a voter. 504 U.S. at 438.

¶58 Accordingly, because Petitioners have failed to show that Section 1(9) prevented them from obtaining a place on the ballot under the reasonable diligence standard, we find that the circumstances created by COVID-19 did not severely burden their constitutional rights. As a result, Section 1(9) is not subject to strict scrutiny.

## C. Important Regulatory Interest

¶59 It is undisputed that Section 1(9) advances the state's "important regulatory interest" of protecting the integrity of the initiative process. *See Stanwitz v. Reagan*, 245 Ariz. 344, 349 ¶ 18, 350 ¶ 21 (2018) (explaining that the "integrity of signature gathering" is protected through petition circulators who "reduce the number of erroneous signatures, guard against misrepresentations, and confirm that signatures were obtained according to law" (citations omitted)); *W. Devcor, Inc.*, 168 Ariz. at 431–32 (explaining that circulator's verification of signatures through an affidavit under Section 1(9) serves as an "important check" that signatures collected are valid); *Direct Sellers Ass'n v. McBrayer*, 109 Ariz. 3, 6 (1972) (explaining that a circulator's affidavit protects against fraud and corruption in the circulation of initiative petitions (citing Ch. 82, Ariz. Sess. Laws, (House Bill 167) (1953))); *see also* Ariz. Const. art. 7, § 12 ("There shall be enacted registration and other laws to secure the purity of elections and guard against abuses of the elective franchise."); *Burdick*, 504 U.S. at 441 (stating that "the right to vote is the right to participate in an electoral process that

---

[5] The Secretary's website provides the PAC's number of valid signatures prior to the verification process. *Initative, Referendum and Recall*, Ariz. Sec'y of State, https://azsos.gov/elections/initiative-referendum-and-recall (last visited Sept. 2, 2020).

is necessarily structured to maintain the integrity of the democratic system").

### D. COVID-19 Cases

¶60        Courts are split on whether ballot access restrictions during COVID-19 impose a severe burden on initiative proponents and prospective candidates. For example, in *Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020 WL 1905747 (D. Ariz. Apr. 17, 2020), Petitioners alleged essentially the same claims as they allege here.[6] There, the federal district court found no severe burden, considering in detail the date the plaintiffs began collecting signatures, overall window of time, and the success of similarly situated individuals. *Id.* at *10–11 (citing *Angle*, 673 F.3d at 1133–34; *Prete*, 438 F.3d at 964, 967). *Hobbs* also stated that to justify the enormity of the relief requested—"displacement of a bedrock component of Arizona law"—Petitioners were required to show "not only that *they* have been thwarted by the law, but that a reasonably diligent party would have been thwarted, too." *Id.* at *11. Like *Hobbs*, most courts have found no severe burden where parties failed to exercise reasonable diligence in seeking ballot access. *See, e.g.*, *Thompson v. Dewine*, 959 F.3d 804, 810 (6th Cir. 2020) (finding no severe burden, in part because initiative proponents failed to make reasonable efforts to collect signatures).

¶61        Courts finding severe burdens due to COVID-19 are distinguishable from this case because: (1) the parties showed that they exercised reasonable diligence; or (2) the state-imposed safety restrictions related to COVID-19 (e.g., stay-at-home orders) limited the parties' ability to collect signatures throughout most of the allotted statutory time period. *See Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *1, *2, *4 (E.D. Mich. Apr. 20, 2020) ("*Esshaki I*") (determining that a candidate was diligent when he began collecting signatures six months prior to the deadline, lacked only 30% of his signatures when the stay-at-home orders went into effect, organized and canceled multiple campaign events, and continued to collect signatures after the onset of COVID-19); *Esshaki v. Whitmer*, No. 20-1336, 2020 WL 2185553, at *1 (6th Cir. May 5, 2020) (affirming the district court in *Esshaki I*); *Garbett v. Herbert*, No. 2:20-CV-245-RJS, 2020 WL 2064101, at *1–4 (D. Utah Apr. 29, 2020) (reducing the statutory minimum signature requirement by approximately one-third where the record contained evidence of the candidate's efforts throughout the time affected by COVID-19; candidate put forth evidence of a 50%

_____

[6] We cite to unpublished district court orders as persuasive authority. Ariz. R. Sup. Ct. 111(d).

signature-rejection rate during the stay-at-home restrictions, candidate contracted with companies to obtain 50,000 signatures—almost twice the required amount—one week prior to her deadline, hired nearly 200 employees for her campaign, attempted remote signature gathering, and collected almost 75% of the required signatures almost exclusively during COVID-19); *Libertarian Party of Ill. v. Pritzker*, No. 20-CV-2112, 2020 WL 1951687, at \*4 (N.D. Ill. Apr. 23, 2020) (determining there was a severe burden, in part because "the window for collecting signatures" opened at nearly the same time as the onset of COVID-19); *Fair Maps Nev. v. Cegavske*, No. 3:20-cv-00271-MMD-WGC, 2020 WL 2798018, at \*12–13 (D. Nev. May 29, 2020) (denying plaintiffs' request to waive in-person requirement but granting request to extend filing deadline because plaintiffs demonstrated reasonable diligence in collecting signatures as soon as practical and continued their efforts to collect signatures during COVID-19). Here, by contrast, Petitioners have not exercised reasonable diligence, and COVID-19 impacted only a small portion of their twenty-month window to collect signatures.

¶62 Petitioners' reliance on *Goldstein v. Secretary of Commonwealth*, 142 N.E.3d 560 (Mass. 2020) is misplaced. There, prospective candidates for elected office requested the court eliminate Massachusetts's statutory minimum signature requirement due to COVID-19 or alternatively, provide equitable relief by modifying state ballot access laws. *Id.* at 563–64. Rather than eliminating the signature requirement, *Goldstein* reduced it, extended the deadline, and allowed candidates to collect electronic signatures. *Id.* at 564.

¶63 *Goldstein* is distinguishable. First, in *Goldstein* the Secretary conceded that the minimum signature requirement, as applied during COVID-19, was subject to, and did not satisfy, strict scrutiny. *Id.* at 569, 571. Thus, the critical issue here—whether the extent of the burden imposed on Petitioners' constitutional rights warrants strict scrutiny—was never addressed by the court. *Goldstein*, therefore, did not conduct a reasonable diligence analysis. *See also Pritzker*, 2020 WL 1951687, at \*4 (similarly stating that the "court need not devote significant additional attention to the constitutional questions presented because . . . the parties have proposed an order that grants appropriate relief," and that "[n]otably, from the outset of these proceedings, even Defendants have acknowledged that the ballot access restrictions must be relaxed, in some shape or form, to account" for COVID-19). Second, in *Goldstein*, the plaintiffs' short, three-month window to collect signatures began one month before the onset of COVID-19, and the Governor's stay-at-home order remained in effect until the filing

deadline had passed. 142 N.E.3d at 566–68; *see also* Sec'y of the Commonwealth, A Candidates Guide to the 2020 State Election 6 (Feb. 2020) (allowing circulation of petitions on February 11, 2020). In contrast, here, Petitioners had twenty months to collect signatures, and only three of those months were impacted by COVID-19.

### E. Voting Rights Cases

**¶64** Petitioners also cite several voting cases that are distinguishable because they address statutes that either disenfranchise a group of voters or violate the principle of one person, one vote. *See Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073, 1076–78 (9th Cir. 2003) (determining that strict scrutiny applied to a regulation that violated the Equal Protection guarantee of "one person, one vote" by effectively giving more weight to some petition signatures in rural areas); *Fla. Democratic Party*, 215 F. Supp. 3d at 1254, 1257 (extending a statutory voter registration deadline five days for individuals who failed to register before a hurricane because imposing the deadline would "completely disenfranchise[] thousands of voters" and "foreclose[] the right to vote" to everyone who had not registered before the hurricane); *Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249-wmc, 2020 WL 1320819, at *5–6 (W.D. Wis. Mar. 20, 2020) (extending a statutory voter registration deadline twelve days because of COVID-19 and reasoning that it would afford voters greater "opportunity to exercise their franchise"); *Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345–46 (S.D. Ga. 2016) (permitting a seven-day extension of a statutory voter registration deadline due to mandatory evacuations caused by a hurricane); *In re Holmes*, 788 A.2d 291, 294–95 (N.J. Super. Ct. App. Div. 2002) (permitting counting of absentee ballots received after statutory deadline where ballots were trapped in a postal facility subject to closure and quarantine due to an anthrax attack where failure to count the votes would "deprive absentee voters of their franchise" to vote).

**¶65** Although restrictions that disenfranchise voters or violate the one-person, one-vote principle are generally subject to strict scrutiny, none of those cases are relevant here. Section 1(9) provides a signature verification requirement; it neither disenfranchises voters nor unequally weighs signatures. *See Lemons*, 538 F. 3d at 1104 (stating that, "[t]o date, the Supreme Court has subjected only two types of voting regulations to strict scrutiny": those that "unreasonably deprive" some persons of the right to vote, and those that "contravene the principle of one person, one vote" (citation omitted) (internal quotation marks omitted)).

¶66        However, attempting to blur the distinction between the right to vote in an election and the right to sign an initiative petition, Petitioners and the dissent claim that our decision disenfranchises Arizonans from voting in initiative elections. We do no such thing. Neither the Federal nor Arizona Constitution guarantees the electorate an unlimited right to vote on *every* initiative, valid and invalid alike, regardless of whether the proponents have made reasonably diligent efforts to comply with ballot access restrictions. *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184–85 (1979) (explaining that properly drawn ballot access restrictions may be valid despite their impact on the rights of voters). Thus, upholding Section 1(9) as a valid requirement for signing petitions does not deprive Arizonans of the right to vote on valid initiatives. *See Angle*, 673 F. 3d at 1130 (stating that although "[v]otes and petition signatures are similar in some respects," they "serve different purposes," and while "ballot access requirement[s] determine[] whether there is a minimum level of grassroots support for an initiative to warrant its inclusion on the ballot," votes in an election measure "the collective, aggregate will of the electorate"); *see Austin*, 994 F.2d at 296 (also noting the distinction from signing a petition and voting).

## V.

¶67        Next, Petitioners argue that Section 1(9), as applied here, violates their right to free speech guaranteed by the First Amendment. Petitioners claim that prohibiting them from "circulating" E-Qual petitions during COVID-19 prevents them from engaging in "core political speech" with potential signers. Additionally, they claim that Section 1(9) is an unconstitutional content-based restriction because candidates are permitted to "speak" by collecting signatures through E-Qual, while initiative proponents are not.

### A. Core Political Speech

¶68        In *Meyer v. Grant*, the Supreme Court addressed the guarantee of free speech in the context of circulating initiative petitions, stating:

> The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to

persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as "core political speech."

486 U.S. 414, 421–22 (1988).

¶**69** The Supreme Court stated that such "direct one-on-one communication" is "the most effective, fundamental, and perhaps economical avenue of political discourse." *Id.* at 424; *see ACLF II*, 525 U.S. at 215 (O'Connor, J., concurring in part and dissenting in part) (stating that "[i]t was the imposition of a direct and substantial burden on th[e] one-on-one communication" occurring "[w]hen an initiative petition circulator approaches a person and asks that person to sign the petition" "that concerned us in *Meyer*").

¶**70** A few years later, in *ACLF II*, the Court explained that *Meyer* applied to restrictions that "significantly inhibit communication with voters." 525 U.S. at 192 & n.12; *see Prete*, 438 F.3d at 962–63 (stating that *ACLF II* "refined" *Meyer*'s analysis regarding what constitutes a "severe burden" by qualifying it as those that "significantly inhibit" core political speech) (emphasis omitted); *see also Angle*, 673 F.3d at 1132–33 (stating that restrictions making it "less likely" for an initiative to qualify for the ballot may impinge upon core political speech if they "significantly inhibit" a reasonably diligent proponent from gaining access to the ballot). The Court observed that, while "[c]irculating a petition is akin to distributing a handbill" because both "involve a one-on-one communication," circulating a petition involves more core political speech because unlike circulating political pamphlets, "[p]etition circulation is [a] less fleeting encounter" and requires "the circulator [to] endeavor to persuade electors to sign the petition." *ACLF II*, 525 U.S. at 199 (citation omitted).

¶**71** Both *Meyer* and *ACLF II* held that laws limiting the available pool of initiative circulators are subject to strict scrutiny because such laws "limit[] the number of voices who will convey [the proponent's] message and the hours they can speak," thereby limiting "the size of the audience they can reach." *Meyer*, 486 U.S. at 418 & n.3, 422–23; *see ACLF II*, 525 U.S. at 192–93 (holding that restrictions that "drastically reduce[] the number of

persons . . . available to circulate petitions" place an "undue hindrance[] to political conversations and the exchange of ideas"); *Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008) (holding that a law limiting the available pool of circulators by requiring they be in-state residents unconstitutionally impinged on the free speech rights of a candidate and his out-of-state-supporters).

¶72 We conclude that Section 1(9) does not violate Petitioners' right to free speech. Section 1(9) is a reasonable, nondiscriminatory ballot access law that does not limit Petitioners' available pool of circulators. *See Pest Comm. v. Miller*, 626 F.3d 1097, 1099, 1107–08 (9th Cir. 2010) (declining to apply *Meyer* to single-subject and description-of-effect laws because such laws "d[id] not directly affect or even involve one-on-one communication"); *Dobrovolny v. Moore*, 126 F.3d 1111, 1112–13 (8th Cir. 1997) (declining to apply *Meyer* to a statutory minimum signature requirement that did not allow proponents to know the exact number of signatures required until they submitted their petitions); *Am. Ass'n of People With Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1227 (D. N.M. 2008) (declining to apply *Meyer* to a requirement that third party voting registrars undergo training); *see also Protect Marriage Ill. v. Orr*, 458 F. Supp. 2d 562, 570–71 (N.D. Ill. 2006), *aff'd sub nom. Protect Marriage Ill. v. Orr*, 463 F.3d 604 (7th Cir. 2006) (distinguishing between restrictions that inhibit a circulator's communication with signers under *Meyer* and those that simply make it more difficult to collect signatures).

¶73 Additionally, signature verification laws such as Section 1(9) do "not restrict the means that the [proponents] can use to advocate their proposal." *Austin*, 994 F.2d at 297; *see Meyer*, 486 U.S. at 417, 427–28 (noting that, in contrast to a law prohibiting paying circulators, which impinged upon core political speech, a law requiring circulators to verify signatures was "adequate to the task of minimizing the risk of improper conduct in the circulation of a petition," and, by implication not violative of core political speech).

¶74 Thus, for example, in *Am. Const. Law Found., Inc. v. Meyer* ("*ACLF I*"), the Tenth Circuit determined that in-person verification requirements do not burden core political speech. 120 F.3d 1092, 1099 (10th Cir. 1997), *aff'd sub nom. ACLF II*, 525 U.S. 182 (1999). In *ACLF I*, the Tenth Circuit addressed several initiative petition circulator statutes, including one requiring a circulator to avow that each signature was collected in his or her presence. *Id.* *ACLF I* upheld this requirement, stating that it did not "significantly burden[]" core political speech by "decreasing the pool of

available circulators." *Id.*; *see Campbell v. Buckley*, 203 F.3d 738, 744 (10th Cir. 2000) (noting that *ACLF I* held that a signature verification law did not impinge on core political speech). Then, in *ACLF II*, the Supreme Court, noting that the Tenth Circuit upheld the verification requirement, approvingly referred to that requirement as a measure by which the state met its "substantial interest[] in regulating the ballot-initiative process" through "less problematic measures." *See ACLF II*, 525 U.S. at 204–05; *see id*. at 215 (O'Connor, J., concurring in part and dissenting in part) (distinguishing between regulations that "directly burden[] . . . one-on-one communication" under *Meyer* and those that "direct[] the manner in which an initiative proposal qualifies for placement on the ballot").

¶75            Simply put, here, COVID-19, not Section 1(9), restricts the ability of circulators to communicate with potential signers. *See Thompson*, 959 F.3d at 810 (stating that "First Amendment violations require state action," and "we cannot hold private citizens' decisions to stay home for their own safety against the [s]tate"); *Morgan v. White*, No. 20 C 2189, 2020 WL 2526484, at *6 (N.D. Ill. May 18, 2020) (stating that although "petition circulators will understandably be unwilling to seek out signatures, and potential supporters will be unwilling to venture out to sign them" during the COVID-19 pandemic, "First Amendment harms" require "state action"); *see also* U.S. Const. amend. I ("*Congress* shall make no law . . . ") (emphasis added); *Manhattan Cmty. Access Corp. v. Halleck*, __ U.S. __, 139 S. Ct. 1921, 1928 (2019) (stating that "[t]he text and original meaning of [the First Amendment], as well as this Court's longstanding precedents, establish that the Free Speech Clause prohibits only *governmental* abridgment of speech. The Free Speech Clause does not prohibit *private* abridgment of speech").

¶76            Petitioners also fail to explain how supplanting Section 1(9)'s procedure with E-Qual protects core political speech. Under E-Qual, individuals sign petitions online by clicking a weblink. When this occurs, there is no circulator present to discuss the initiative with the signer; indeed, as a practical matter, E-Qual's online procedure does not *require* any communication between a circulator and a signer. In contrast, by requiring in-person signatures, Section 1(9) increases in-person communication. *See Hobbs*, 2020 WL 1905747 at *8 (stating that "[t]he in-person signature requirements of Title 19 affirmatively promote speech"); *Morgan*, 2020 WL 2526484 at *6 (stating that as a general matter, in-person signature requirements "may in fact increase the amount of one-on-one communication between petition circulators and voters"); *see also Angle*, 673 F.3d at 1132–33 (stating that Nevada's law "requiring initiative proponents

to carry their messages to voters in different parts of the state" "likely *increase*[*d*] the total quantum of speech on public issues" (citation omitted)).

## B. Content-Based Restriction

**¶77** Citing *Reed v. Town of Gilbert* as authority, Petitioners argue that Section 1(9) is a content-based regulation because it denies initiative proponents' access to E-Qual, placing a greater restriction on the political speech of initiative proponents than candidates, who have access to E-Qual. 576 U.S. 155, 164 (2015).

**¶78** "[L]aws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994); *see also Reed*, 576 U.S. at 164. Additionally, laws that are facially neutral "will be considered content-based" if they "cannot be justified without reference to the content of the regulated speech, or [] were adopted by the government because of disagreement with the message [the speech] conveys." *Reed*, 576 U.S. at 164 (internal citation omitted) (internal quotation marks omitted). Content-based laws must satisfy strict scrutiny. *Id.*

**¶79** Petitioners' reliance on *Reed* is misplaced. There, the Supreme Court determined that a town's sign code was content based because it gave less favorable treatment to political signs and signs "directing the public to church." *Id.* at 164. Here, all initiative proponents must comply with Section 1(9), regardless of the initiative's message. *See Prete*, 438 F.3d at 968 n.24 (stating that a law restricting payment method for initiative circulators, but not candidate nomination circulators, was not content based because it did not "regulate what c[ould] be said . . . [] nor d[id] it adopt or reject any particular subject that can be raised in a petition"); *see also Semple v. Griswold*, 934 F.3d 1134, 1142 (10th Cir. 2019) (determining that a law making it more difficult and expensive to enact legislation through initiative measures was not content based).

## VI.

**¶80** We further note that even if Section 1(9) triggers strict scrutiny, it is constitutional because it is the least restrictive means practically available to promote the state's compelling interest.

**¶81** Section 1(9)'s purpose—to protect the integrity of initiative elections—is a compelling one. *See supra* ¶ 59; *Purcell v. Gonzalez*, 549 U.S.

1, 4 (2006) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government."); *Thompson*, 959 F.3d at 811 (stating that in-person verification laws that "help prevent fraud by ensuring that the signatures are authentic" is a "compelling" state interest). Thus, the only issue is whether Section 1(9) is narrowly tailored to advance that interest.

¶82　　　A law is narrowly drawn if it advances a compelling state interest by using the "least restrictive means practically available." *Bernal v. Fainter*, 467 U.S. 216, 227 (1984); *see Kenyon v. Hammer*, 142 Ariz. 69, 87–88 (1984) (same). Thus, strict scrutiny requires the "least restrictive means among available, effective alternatives." *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 666 (2004); *see State v. Hardesty*, 222 Ariz. 363, 368 ¶ 21 (2009) (stating that the least restrictive means test requires that the state "show that proposed alternatives for achieving the State's compelling interest are ineffective or impractical" but does not require the state to show "that no less restrictive way to regulate is conceivable, only that none has been proposed").

¶83　　　Here, E-Qual does not provide a viable alternative to Section 1(9)'s in-person verification procedure because: (1) E-Qual has no existing statutory or regulatory scheme to replace Section 1(9)'s signature verification procedure; and (2) Petitioners have failed to show that the Secretary can expand E-Qual in the truncated timeframe necessary to provide Petitioners relief.

## A. Procedure for Verifying Signatures

¶84　　　Petitioners claim that the statutory provisions governing E-Qual can, with "minor adjustments," be extended to initiative petitions. We disagree.

¶85　　　Section 1(9), and its related Title 19 scheme, provide a detailed procedure for verifying and validating initiative petition signatures. Initially, an affiant/circulator witnesses and verifies initiative signatures. *See* § 19-112. Next, Title 19 requires the Secretary to independently verify and validate initiative petition signatures. *See* A.R.S. § 19-121.01(A)(1)(a)–(h), (2)(a)–(c), (3)(a)–(f). Then, the Secretary must randomly select five percent of the remaining signatures and send them to the county recorders for verification. *Id.* at (B)–(D), -121.02(A)(1)–(11). After the recorders finish their verification process, the Secretary then determines whether the total

remaining number of valid signatures satisfies the constitutional minimum requirements.  § 19-121.04(B).

¶86        However, the Title 16 scheme governing E-Qual signatures is different than Title 19's scheme.  Under Title 16, petition signatures are presumed valid, and unless challenged by a party, neither the Secretary nor the county recorders verify them.  *See* A.R.S. § 16-351(E) (explaining that county recorders verify candidate nominating petition signatures only after a challenge is filed); *Jenkins v. Hale*, 218 Ariz. 561, 562–63 ¶ 8 (2008) (stating that candidate nominating petitions are generally presumed valid).

¶87        It is unclear how the Title 19 scheme regulating initiative petition circulators would apply to signatures obtained through E-Qual. For example, Title 19 requires that each petition specify whether the signatures were obtained by a volunteer or paid circulator.  A.R.S. §§ 19-101(C), -102(C).  Presumably, individuals compensated for sharing E-Qual weblinks with potential signers would qualify as initiative circulators.  *See* A.R.S. § 19-118(I)(1) (stating that a "paid circulator" is a "person who receives monetary or other compensation *for obtaining signatures*" (emphasis added)).  However, apart from the general "circulator statement" filed by a candidate, *see supra* ¶ 32, the record contains no evidence that E-Qual has the capability to identify individual petitions according to the specific "circulator" who shared the petition's weblink.

¶88        And of course, like the verification process, Title 19 and Title 16 have very different requirements for circulators.  For example, under Title 19, an initiative petition circulator must register with the Secretary if he or she is a nonresident or receives payment for circulating a petition. § 19-118(A).  A candidate petition circulator, by contrast, must register with the Secretary only if he or she is a nonresident.  A.R.S. §§ 16-315(D), -341(G). Initiative circulators must be assigned a "registration number," whereas candidate petition circulators are not.  § 19-118(C); *see* § 16-315.  Finally, under § 19-112(C)–(D), initiative petitions must contain a notarized affidavit, attesting that the circulator witnessed the signature in person.  No such affidavit or notarization is required for candidate petitions.  A.R.S. § 16-321(D).

¶89        Compounding this problem is the fact that it is unclear which, if any, of Title 16's signature verification procedures apply to E-Qual. Specifically, the legislature has delegated broad authority to the Secretary to use "an appropriate method" to verify E-Qual signatures.  *See*

§§ 16-315(E), -341(M). But neither Petitioners nor the Secretary identify a standard or procedure prescribing this "appropriate method."

¶90 Indeed, to date, the Secretary has not published *any* standards for verifying E-Qual signatures, nor are we able to discern that she has adopted such standards. The Secretary's Elections Procedures Manual simply states that prospective candidates may use E-Qual. Ariz. Sec'y of State, 2019 Elections Procedures Manual 108, 111 (2019). It sets forth no procedure for using E-Qual. And although the Arizona Department of Administration ("ADOA") published a five-page policy for the state's use of electronic signatures, that policy provides little guidance here. Specifically, ADOA's policy simply requires that electronic signatures be: (1) unique to each signer; (2) capable of verification; (3) invalidated if altered within the system; and (4) electronically copied and archived with the Arizona State Library. *See* Ariz. Dep't of Admin., P4070 Electronic and Digital Signature Policy 3 (2017); *see also* A.R.S. § 18-106(C) (to same effect).

¶91 Arizona Administrative Code R2-12-501(L) and R2-12-503 provide that the Secretary will adopt guidelines under the "Certification Authority Rating and Trust" ("CARAT") model for certifying new technologies. But the record does not establish whether the Secretary has applied CARAT guidelines to E-Qual. And even if she has, those guidelines do not provide a procedure for validating and verifying signatures. *See* Nat'l Automated Clearing House Ass'n, CARAT Guidelines Version 1 Draft (1998) (providing general advice for certifying and implementing new technologies from an engineering, business, and policy perspective).

¶92 Finally, according to the Secretary's website, the Secretary is required to maintain an "Approved List of Certified Authorities" authorized to issue certificates for electronically signed communications with public entities in Arizona. *See Arizona Administrative Code*, Ariz. Sec'y of State, https://azsos.gov/rules/arizona-administrative-code (last visited Aug. 7, 2020) (posting regulations requiring same); *see also* Ariz. Admin. Code R2-12-501(B), -504 (requiring the Secretary to audit and maintain an "Approved List of Certified Authorities" for "electronically signed transactions involving public entities"). But E-Qual is not a properly "certified authority" on that list. Indeed, the "Approved List of Certified Authorities" does not exist. Although the state has an exempted rule-making form from 1999 on file, *see* Notice of Exempt Rulemaking, 1–2 (1999), it is unclear who is now responsible for certifying E-Qual, how long the Secretary is exempt, and whether the Arizona Administrative Code will be updated to reflect the correct agency. As a result, based on this record,

we are unable to conclude who is responsible for certifying E-Qual and whether E-Qual is properly authorized to accept *any* electronic signatures, much less initiative signatures.

## B. Expansion of E-Qual

**¶93** The Secretary provides conflicting statements about her ability to expand E-Qual before the July 2 deadline. Although she claims that she "stands ready" to expand E-Qual with her existing staff and without additional funding, she candidly admits that expanding E-Qual to process initiative petitions, for even a few initiative measures, could "dwarf" the number of "candidate petitions historically handled by the system." This is undoubtedly true. In the recent 2020 candidate filing period, the Secretary states she processed approximately 58,000 E-Qual signatures. In contrast, a *single* initiative measure requires 237,645 signatures, and at the time of Petitioners' special action, *twenty-four* statutory initiatives had already been filed. *Initiative, Referendum and Recall Applications*, Ariz. Sec'y of State, https://apps.arizona.vote/info/IRR/2020-general-election/18/0 (last visited Aug. 14, 2020). Indeed, we now know that three of the Petitioners, as well as another initiative proponent, have in fact filed just over one million signatures, or approximately *twenty times* the number of signatures processed in the last candidate nomination period.

**¶94** Although the Secretary claims that expanding E-Qual to process this large number of initiative petitions is "feasible," she also concedes that maintaining and supporting such a large number of individual E-Qual petitions for statewide ballot initiatives will result in an "increased workload" and additional "infrastructure demands," requiring additional webservers and technical support. And because each initiative proponent must be given credentials and trained to manage E-Qual petitions, she notes that this will "require staff time to on-board [each] new initiative committee and provide troubleshooting and support as issues arise with specific petitions."

**¶95** The Secretary has had difficulty expanding E-Qual for candidate petitions in the past, raising serious questions about her capability to do so here. In 2016, the legislature tasked the Secretary with expanding E-Qual to make it available for candidates in local elections. H.B. 2049 52nd 2nd Reg. Sess. (2016); § 16-317. It took the Secretary four years, or until May 4, 2020, to finish the expansion. *See* Press Release, Ariz. Sec'y of State, Secretary of State's Office Successfully Completes Transition

to Arizona Voter Information Database, https://azsos.gov/about-office/media-center/press-releases/1064 (last visited Aug. 14, 2020). Nevertheless, she claims that she can expand E-Qual to cover statewide initiatives within four weeks. She attempts to distinguish the expansion for local candidates based on the "logistical complexities" of accommodating multiple "election systems" and providing the "necessary training and administrative support for local filing officers and candidates." The Secretary also claims that the delay in the county roll-out resulted from issues with AVID. But since her office is responsible for operating and maintaining AVID, this delay seems to underscore the impracticability of expanding E-Qual here. And we are left to speculate as to why, on a vastly larger project, similar obstacles would not occur. Indeed, in a rather telling statement, she asks us to limit E-Qual to currently filed initiatives. We cannot, of course, on constitutional grounds, provide relief to some initiatives in the face of COVID-19 and not others.

¶96        In short, E-Qual does not provide a practical, available alternative to Section 1(9)'s verification procedure. The record does not establish how the Secretary can expand E-Qual to process initiative petitions without additional staff and funding. And if she cannot expand E-Qual here, the proffered remedy could be worse than the problem. Specifically, if we grant Petitioners access to E-Qual, and the system fails, they would, relying on the Secretary's avowals, be more disadvantaged than if they attempted to obtain in-person signatures.

¶97        The dissent contends that Section 1(9) is not the least restrictive means to advance the state's interest, suggesting that reducing the signature requirement or permitting virtual signature collection, as mentioned by the Intervenor-Respondent Attorney General, might be less restrictive alternatives. But in determining whether a law is narrowly tailored, we need not consider every "conceivable" alternative, *see Hardesty*, 222 Ariz. at 368 ¶ 21, and the Attorney General does not ask for either of the dissent's suggested remedies. Rather, the Attorney General only briefly comments that *Petitioners* failed to explore these alternatives by requesting the drastic remedy of striking down Section 1(9). Simply put, the Attorney General insists that Section 1(9) is constitutional, and Petitioners are not entitled to *any* relief.

¶98        The dissent also suggests an extraordinary remedy by proposing that we enjoin the Secretary from enforcing Section 1(9) without ordering she expand E-Qual. As a practical matter, this could leave Petitioners with no means to submit electronic signatures, effectively

denying all relief. The dissent also offers that "the state" might impose new verification requirements "through executive order or otherwise." But this solution is neither viable nor constitutional. The Governor and Secretary lack the constitutional authority to unilaterally rewrite Title 19's verification scheme. And even if Section 1(9) were eliminated and the legislature tried to create a new statutory verification scheme that did not unreasonably hinder or restrict other constitutional provisions, *see Turley*, 27 Ariz. App. at 348, this is an impractical suggestion given Petitioners' need for immediate, final relief.

¶99　　At bottom, there are less extreme solutions than eliminating a constitutional provision in hopes that another government office will—without constitutional authority—replace it. Petitioners instead might have tried, as Respondents suggested, single-use pens, advertising through social media, or scheduling appointments with signers while maintaining a six-foot distance. In fact, Petitioners' collection of more than one million signatures without E-Qual indicates they did just that.

## VII.

¶100　　Finally, Petitioners claim that Section 1(9) violates the Arizona Constitution's guarantees of equal protection, due process, and free speech. But because Petitioners have not explained how these provisions, in the context of ballot restrictions, afford them greater protection than the Federal Constitution, we do not address them here. *See State v. Jean*, 243 Ariz. 331, 341–42 ¶ 39 (2018) (stating that a party forfeits a state constitutional claim by "[m]erely referring to the Arizona Constitution" and failing to develop the argument); *State v. Fisher*, 226 Ariz. 563, 565 n.3 (2011) (declining to address a state constitutional claim where the party failed to develop a "separate argument based on th[e] provision or explain how [the] analysis" should differ from federal jurisprudence).

## Conclusion

¶101　　For the foregoing reasons, we deny Petitioners' requested relief.

LOPEZ, J. joined by MONTGOMERY, J., concurring.

**¶102**        The dissent rightly laments the costs of the pandemic to our citizens' "health, employment, schooling, mobility, social connections, and finances." *Infra* ¶ 119. We share this sentiment, for we are all in this together. And we do not discount Petitioners' very real dilemma borne of the impediments posed by the pandemic to their efforts to qualify initiatives for the ballot. But, respectfully, Petitioners' requested cure – effective suspension of constitutional and statutory law and recrafting of essential election provisions on the fly by judicial fiat – is worse than the disease. It is far preferable to face the pandemic's circumstantial barriers to signature gathering and to bear the theoretical risk that initiative ballot access may be hindered in a single election cycle, when those costs lay solely at the feet of the pandemic, than to diminish the rule of law forever by the hand of this Court. *Cf. Korematsu*, 323 U.S. at 245-46 (Jackson, J., dissenting) (warning that a military official's overstepping of the bounds of the constitution is an incident, "[b]ut if we review and approve, that passing incident becomes the doctrine of the Constitution").

Arizonans For Second Chances, et al. v. Hobbs
VICE CHIEF JUSTICE TIMMER, concurring in Parts II and III, and
dissenting in Parts IV-VII.

TIMMER, V. C. J., concurring in part and dissenting in part.

¶103      Life as we know it has been upended by the COVID-19 pandemic sweeping the world. On the heels of public health emergencies declared nationally and globally, Governor Douglas A. Ducey declared a public health emergency in Arizona on March 11, 2020 "due to the necessity to prepare for, prevent, respond to, and mitigate" the "community spread" of COVID-19. *See* Exec. Orders Nos. 2020-07, 2020-09.

¶104      During the weeks that followed, the Governor issued several executive orders aimed at slowing the virus's spread until March 30, when he issued a "Stay-at-Home" order. *See* Exec. Order No. 2020-18. Among other things, he ordered everyone in Arizona to stay home, with limited exceptions, and maintain at least a six-foot physical distance from others while in public. *See id.* Movie theatres, gyms, restaurant dine-in services, hair salons and the like were closed. *See id.*; Exec. Order No. 2020-09. Schools shut their doors. *See* Exec. Order No. 2020-18. The Arizona Department of Health Services advised "canceling or postponing gatherings of 10 or more people," and public events were cancelled. *Id.* The Centers for Disease Control and Prevention advised people to "[r]educe sharing of common spaces and frequently touched objects" to minimize exposure. *Guidance for Cleaning and Disinfecting*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/cleaning-disinfecting-decision-tool.html (last updated May 7, 2020). The Stay-at-Home order initially remained in effect until April 30, and, as of May 13, the date we issued our order denying relief in this case, it remained in effect, with modifications. *See* Exec. Orders Nos. 2020-33, 2020-36. These were the circumstances Petitioners navigated in gathering petition signatures before the July 2 submission deadline.

¶105      I join in parts II and III of the majority's decision. I disagree, however, with the remainder. Instead, I conclude that, as applied here, the State's strict enforcement of the Arizona Constitution's in-person signature and verification requirements (hereinafter, the "wet-signature requirement"), Ariz. Const. art. 4, pt. 1, § 1(9), and Governor Ducey's Stay-at-Home order during the current pandemic combined to impinge individuals' voting and associational rights in violation of the First and Fourteenth Amendments to the United States Constitution.

¶106      Although Arizona is not required to grant people the right to enact laws through the initiative process, having done so, it does not have

Arizonans For Second Chances, et al. v. Hobbs
VICE CHIEF JUSTICE TIMMER, concurring in Parts II and III, and
dissenting in Parts IV-VII.

free rein in regulating that right. *See Meyer v. Grant*, 486 U.S. 414, 424–25 (1988) (rejecting Colorado's assertion that because the initiative is a state-created right, the state is free to impose any limitation for its exercise). As pertinent here, ballot-access restrictions for initiative petitions, as for candidates, cannot unduly or unfairly burden the fundamental "right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Anderson v. Celebrezze*, 460 U.S. 780, 787–88 (1983) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)); *see also Meyer*, 486 U.S. at 421–22 (concluding that the circulation of an initiative petition "involves the type of interactive communication concerning political change that is appropriately described as 'core political speech'"); *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073, 1077 (9th Cir. 2003) (observing that petitions to place initiative measures on the ballot implicate the fundamental right to vote); *Lemons v. Bradbury*, 538 F.3d 1098, 1102 (9th Cir. 2008) (to same effect). Indisputably, the rights to engage in political discourse and to vote "rank among our most precious freedoms." *Anderson*, 460 U.S. at 787 (quoting *Williams*, 393 U.S. at 30).

¶107 To decide whether a ballot-access restriction improperly burdens First Amendment rights, I agree with the majority that we apply the framework set out in *Anderson*, as refined by *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). We initially examine the "character and magnitude of the asserted injury" on individual constitutional rights. *Anderson*, 460 U.S. at 789. If the burden is "severe," we apply strict scrutiny, upholding the restriction only if it is "narrowly drawn to advance a state interest of compelling importance." *See Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). If the burden is reasonable and nondiscriminatory, we will uphold the restriction if justified by a state's important regulatory interests. *See Anderson*, 460 U.S. at 788; *Burdick*, 504 U.S. at 434.

¶108 Importantly, in applying the *Anderson/Burdick* framework, we consider the electorate's rights as well as Petitioners' rights. *See Anderson*, 460 U.S. at 786 (recognizing that "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters" (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972))); *Burdick*, 504 U.S. at 433–34 (focusing the inquiry on whether a challenged law unduly affects "the individual's right to vote and his right to associate with others for

Arizonans For Second Chances, et al. v. Hobbs
VICE CHIEF JUSTICE TIMMER, concurring in Parts II and III, and
dissenting in Parts IV-VII.

political ends" (quoting *Anderson*, 460 U.S. at 788)). The majority loses sight of the electorate's rights, which are never touched on.

¶109 Unlike my colleagues, I conclude that the one-two-three punch delivered by the wet-signature requirement in tandem with the Stay-at-Home order and the pandemic severely burdened individuals' voting and associational rights. *See Williams*, 393 U.S. at 34 (examining "the totality of the Ohio restrictive laws taken as a whole" to decide whether the burden imposed violates equal protection); *Goldstein v. Sec'y of Commonwealth*, 142 N.E.3d 560, 570 (Mass. 2020) (recognizing that "statutory requirements that were once considered constitutionally permissible may later be found to interfere significantly with a fundamental right as societal conditions and technology change"). At a time when Arizonans were acclimating to wearing masks, staying at least six feet away from others, and all but dousing themselves in hand sanitizer, only the hardiest permitted a stranger to approach to discuss an initiative petition or obtain a signature. This was so even though the Stay-at-Home order explicitly permitted Arizonans to "engage in constitutionally protected activities" with "appropriate physical distancing." *See* Exec. Order No. 2020-18. Declarations submitted by Petitioners and amici evidence this common-sense conclusion:

- Save Our Schools Arizona, which relied solely on unpaid volunteers to circulate petitions, saw signature-gathering "slowed to a near-halt" because circulators could no longer collect signatures at large-scale events and "where there [were] still potential signers out and about, they [were] increasingly hesitant to interact despite the use of mitigation measures by petition circulators."

- AZ Petition Partners, LLC, a petition gathering and consulting firm for three Petitioners, required its 330 employed petition circulators to use hand sanitizer and single-use pens and to disinfect clipboards and other materials used in gathering signatures. Regardless, circulators reported that potential signers gathered in any significant number, such as in lines at a grocery store, were "increasingly hesitant to interact with petition circulators" before the Stay-at-Home order and were "even less likely" to interact or sign a petition after implementation of that order.

- Arizona Grassroots Advocates, LLC, gathered signatures for Petitioner Second Chances, Rehabilitation, and Public Safety Act, primarily going door-to-door and interacting with residents. As the virus spread, the

Arizonans For Second Chances, et al. v. Hobbs
VICE CHIEF JUSTICE TIMMER, concurring in Parts II and III, and
dissenting in Parts IV-VII.

LLC's 156 circulators used appropriate social distancing, wore gloves, and offered hand sanitizer to residents and the option of using residents' own pens to sign petitions. Despite these precautions, circulators reported that "people were less and less willing to open their doors." After implementation of the Governor's Stay-at-Home order, the LLC experienced "another significant drop" in signatures as "people [were] even less likely to open their doors." And when they did so, "they overwhelmingly refuse[d] to touch the clipboard, petition sheet, and pens necessary to sign the petition," and many commented that circulators should not be going door-to-door as "it [was] not safe or legal." On at least two occasions, homeowners threatened to call the police.

- Eighty-two-year-old Philip J. Adelman, a retired U.S. Air Force lieutenant colonel, signed many initiative petitions throughout the years and "had every intention of continuing to do so during this year's election cycle." But the senior living community where he and his wife reside banned visitors from the community, including petition circulators, except in emergency or end-of-life situations. Residents were also prohibited from leaving the community, except to receive medical care. He lamented that "without the opportunity to sign petitions via an online mechanism," he and others in senior living communities in Arizona "[would] be deprived of this important right to participate directly in our democracy."

- Bridget Olson, a sixty-five-year-old retired teacher, volunteered to circulate petitions for the Save Our Schools Act initiative. She stopped doing so in mid-March because "older" Arizonans are at risk of becoming ill with COVID-19 and she did not wish to potentially expose petition signers to the virus. Before the pandemic, she had circulated petitions in retirement communities and planned to circulate petitions at a group home and rehabilitation center but had to cancel when informed that "[n]o visitors are allowed," in light of the pandemic.

¶110 I have no trouble concluding that the wet-signature requirement and Governor Ducey's Stay-at-Home order combined during the pandemic to severely burden individuals' First and Fourteenth Amendment rights to vote and to associate to engage in political discourse. *See Goldstein*, 142 N.E.3d at 571 ("No fair-minded person can dispute that the fundamental right to run for elective office has been unconstitutionally burdened or interfered with by the need to obtain the required 'wet' signatures in the midst of this pandemic."). The only way to qualify an

Arizonans For Second Chances, et al. v. Hobbs
VICE CHIEF JUSTICE TIMMER, concurring in Parts II and III, and
dissenting in Parts IV-VII.

initiative for the ballot is to obtain a sufficient number of wet signatures gathered in the physical presence of circulators—an improbable feat during the pandemic. *Cf. Burdick*, 504 U.S. at 441 (looking at Hawaii's entire electoral system in deciding whether, despite the ban on write-in voting, candidates were afforded "constitutionally sufficient ballot access"). Obviously, without initiatives on the ballot, Arizonans could not fully exercise their rights to associate and debate the merits of those proposals or vote on them. *See Meyer*, 486 U.S. at 421–23 (concluding that restrictions on the initiative process can severely burden "core political speech" by making it less likely that an initiative will qualify for the ballot, thus limiting proponents' ability "to make the matter the focus of statewide discussion"); *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) ("By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences."). Strict scrutiny review is warranted. *See Burdick*, 504 U.S. at 434.

**¶111** The majority reaches the opposite conclusion. It reasons that Petitioners failed to demonstrate a severe burden on voting and associational rights because they were not reasonably diligent in collecting signatures, despite uncontested evidence that all four Petitioners were on-track before the pandemic to collect a sufficient number of signatures by the July 2 filing deadline. My colleagues essentially fault Petitioners for not anticipating the pandemic and gathering signatures earlier, which may have lessened the burden of the wet-signature requirement as applied here. *See supra* ¶¶ 46–50. I disagree for two reasons.

**¶112** First, the cases the majority relies on considered whether ballot-access restrictions alone, applied during non-emergency times, imposed a severe burden and appropriately asked whether a reasonably diligent candidate or initiative proponent could be expected to gain access to the ballot in light of these restrictions. *See, e.g., Storer v. Brown*, 415 U.S. 724, 742 (1974); *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012). If Petitioners had challenged the wet-signature requirement in normal times, I would agree that a reasonably diligent initiative proponent could be expected to gather a sufficient number of signatures to qualify for the ballot. But Petitioners challenge the wet-signature requirement as applied in combination with the Stay-at-Home order and during a pandemic. Thus, the appropriate inquiry, which the majority disdains, is whether a reasonably diligent initiative proponent could be expected to gain access to the ballot *after* the Stay-at-Home order and the pandemic metaphorically yanked the rug from under the proponent's feet with several months

Arizonans For Second Chances, et al. v. Hobbs
VICE CHIEF JUSTICE TIMMER, concurring in Parts II and III, and
dissenting in Parts IV-VII.

remaining before the petition-filing deadline. *See Storer*, 415 U.S. at 742 (acknowledging the impact of societal conditions on the constitutionality of ballot-access restrictions by considering whether "in the context of California politics" a reasonably diligent independent candidate could be expected to satisfy restrictions and access the ballot).

¶113 Second, resting the severe-burden inquiry on whether Petitioners were reasonably diligent in gathering signatures before the Stay-at-Home order effectively required Petitioners to gather signatures well in advance of the election. But requiring early signature gathering when the election is far in the future itself burdens those efforts. As the *Anderson* Court observed in striking Ohio's early-filing requirement for independent candidates, when an election is remote in time, "the obstacles facing an independent candidate's organizing efforts are compounded" because "[v]olunteers are more difficult to recruit and retain, media publicity and campaign contributions are more difficult to secure, and voters are less interested in the campaign." 460 U.S. at 792. The same reasoning holds true for initiative campaigns, which may logically choose to focus signature-gathering efforts in the election year to rally volunteers and create a sustained "buzz" among voters in the run-up to election day. Indeed, this may explain why proponents of the only two initiatives on the 2018 ballot filed their applications with the Secretary of State, respectively, on February 20 and March 9 that year before starting to gather signatures. *See* Voter Registration & Historical Election Data, *Ariz. Sec'y of State*, https://azsos.gov/elections/voter-registration-historical-election-data (last visited Aug. 27, 2020). And of the five citizen initiatives on the ballot from 2010 through 2016, proponents for three of the five filed their applications, respectively, on March 9 (twice) and March 30 in the election years before gathering signatures. *Id.*

¶114 The majority also cites to events that occurred after our May 13 order to justify its decision, even though, of course, those events had no bearing on that decision. *See supra* ¶ 7. It notes that three of the four Petitioners were able to collect a sufficient number of signatures to ostensibly qualify for the ballot (one initiative was disqualified by the Secretary for an insufficient number of valid signatures), so the burden on voting and associational rights must not have been severe. *See id.* What would my colleagues have said if only one of the Petitioners had gathered a sufficient number of signatures? Or none? And what does it mean that the only Petitioner not to collect sufficient signatures, Save Our Schools Arizona, was the only Petitioner that relied exclusively on unpaid

Arizonans For Second Chances, et al. v. Hobbs
VICE CHIEF JUSTICE TIMMER, concurring in Parts II and III, and
dissenting in Parts IV-VII.

volunteers? Regardless, how Petitioners or other initiative proponents ultimately fared does not shed light on whether a reasonably diligent proponent could be expected to gather a sufficient number of signatures after implementation of the Stay-at-Home order and during the pandemic. And, with respect, a three-out-of-four success rate doesn't cut it constitutionally when assessing the burden on the "most precious" of our constitutional rights. *See Anderson*, 460 U.S. at 787 (quoting *Williams*, 393 U.S. at 30).

¶115        Turning to strict scrutiny review, I agree with the majority that the State has a compelling interest in ensuring the validity of signatures, which, in turn, protects the integrity of initiative elections. *See supra* ¶ 5. But I conclude that the Secretary did not satisfy her burden to show that the wet-signature requirement is narrowly drawn to advance that interest. *See Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989) (placing burden of proof on the state). Federal, statewide, and legislative candidates can collect petition signatures electronically using E-Qual, which verifies the voter's identity and ensures the voter is properly registered, resides in the correct district to sign a particular petition, and is otherwise eligible to sign that petition. According to the State Elections Director in the Secretary's office, E-Qual signatures are so trustworthy, they "can generally be counted as valid without further review by the filing officer or the County Recorder." He also avowed that the E-Qual system could be configured in about four weeks for use by initiative proponents in gathering signatures. Alternatively, as Intervenor-Respondent Attorney General pointed out, the state might have permitted use of virtual platforms by circulators to gather signatures just as "signers and notary publics [may] meet using the internet and audio-video technology to verify identity." *See* Exec. Order No. 2020-26. The fact that less restrictive alternatives to the wet-signature requirement existed demonstrates that the requirement, although likely narrowly drawn when created, was not narrowly drawn to advance the state's interest in pandemic circumstances. *See Chelsea Collaborative, Inc. v. Sec'y of Commonwealth*, 100 N.E.3d 326, 334 (Mass. 2018) ("What was perhaps a reasonable regulation that insignificantly interfered with the right to vote thirty-five, one hundred, or 200 years ago may be considered to significantly interfere with the exercise of that right today in light of technological change and the reasonable expectations of Massachusetts citizens.").

¶116        Other jurisdictions that have addressed comparable issues during this pandemic, albeit not all jurisdictions, have reached similar

Arizonans For Second Chances, et al. v. Hobbs
VICE CHIEF JUSTICE TIMMER, concurring in Parts II and III, and
dissenting in Parts IV-VII.

conclusions. *See*, *e.g.*, *Esshaki v. Whitmer*, 813 F. App'x 170, 171–72 (6th Cir. 2020) (concluding that "the combination of the State's strict enforcement of the ballot-access provisions and the Stay-at-Home Orders imposed a severe burden on the plaintiff's ballot access" and applying strict scrutiny to hold that "the [restrictive] provisions are not narrowly tailored *to the present circumstances*" and are therefore unconstitutional as applied); *Libertarian Party of Ill. v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020) (enjoining Illinois's wet-signature and verification requirements in favor of electronic signatures); *Goldstein*, 142 N.E.3d at 571 ("There are alternatives that could preserve the legislative purpose that a candidate demonstrate a certain level of support in order to win a place on the ballot and yet protect the public from the health risks associated with obtaining 'wet' signatures."); *Omari Faulkner for Va. v. Va. Dep't of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (reducing signature-gathering requirements for candidates and allowing electronic signatures); *Dennis v. Galvin*, No. SJ-2020-278 (Mass. Apr. 29, 2020) (extending *Goldstein* to allow initiative proponents to collect signatures electronically). Other states have permitted electronic signatures by executive orders. *See Thompson v. DeWine*, No. 2:20-CV-2129, 2020 WL 2614447, at *5 (S.D. Ohio May 22, 2020) (collecting orders).

¶117 Having found that the wet-signature requirement violated individuals' First and Fourteenth Amendment rights as applied in these unique circumstances, I conclude Petitioners were entitled to relief. They asked us to order the Secretary to grant them access to E-Qual and to enjoin the Secretary from enforcing any Arizona law precluding that use. I would not have granted this precise relief, because it is not our role to direct the process for qualifying initiative petitions for the ballot. But it is our role to enjoin enforcement of unconstitutional ballot-access restrictions, even those provided by our state constitution. *See Reynolds v. Sims*, 377 U.S. 533, 584 (1964) ("When there is an unavoidable conflict between the federal and a State Constitution, the Supremacy Clause of course controls."). Thus, I would have enjoined the Secretary from enforcing the wet-signature requirement. *See Fairness & Accountability in Ins. Reform v. Greene*, 180 Ariz. 582, 592–93 (1994) (finding a violation of election statute and imposing a different remedy from ones requested by plaintiffs). This relief would not have foreclosed the state from putting new requirements in place, through executive order or otherwise, designed to verify petition signatures using means that do not severely burden the electorate's voting and associational rights. *Cf. Esshaki*, 813 F. App'x at 171 (prohibiting enforcement of ballot-

Arizonans For Second Chances, et al. v. Hobbs
VICE CHIEF JUSTICE TIMMER, concurring in Parts II and III, and
dissenting in Parts IV-VII.

access restrictions unless the State "provides some reasonable accommodations to aggrieved candidates").

**¶118** Courts must refrain from compromising the rule of law simply to ease hardships faced during an emergency. The long-term harm to this bedrock principle would not be worth any fleeting benefit. But when a state law restricting access to the ballot applies to violate fundamental federal constitutional rights to vote and to associate, as occurred here, we can only preserve the rule of law by striking that restriction.

**¶119** The current pandemic has deeply impacted Arizonans' health, employment, schooling, mobility, social connections, and finances. I'm saddened to add infringement of our "most precious" voting and associational rights to that list.

BOLICK, J., dissenting from the grant of jurisdiction.

¶120    Special actions are appropriate only in limited circumstances, and those circumstances are not present here. We should decline to exercise our discretion to grant jurisdiction in this case.

¶121    Rule 3 of the Rules of Procedure for Special Actions states as follows:

> The only questions that may be raised in a special action are:
> (a) Whether the defendant has failed to exercise discretion which he has a duty to exercise; or to perform a duty required by law as to which he has no discretion; or
> (b) Whether the defendant has proceeded or is threatening to proceed without or in excess of jurisdiction or legal authority; or
> (c) Whether a determination was arbitrary or an abuse of discretion.

Ariz. R.P. Spec. Act. 3.

¶122    A special action requests extraordinary relief, acceptance of jurisdiction is highly discretionary, and the plaintiff bears the burden of persuasion to establish the discretionary factors. *Id.* state bar committee's note. If the plaintiff fails to establish one of the grounds for special action, review should be denied. *See, e.g., Kord's Ambulance Serv., Inc. v. City of Tucson*, 157 Ariz. 311, 313 (App. 1988). Although special action relief may be appropriate where a prompt legal determination is necessary, it is not enough that proceedings in trial court may be time-consuming. *See, e.g., Caruso v. Superior Court*, 100 Ariz. 167, 171 (1966); *Neary v. Frantz*, 141 Ariz. 171, 177 (App. 1984) ("A remedy does not become inadequate merely because more time would transpire by pursuing a conventional action."). Rather, as a threshold requirement, Petitioners must demonstrate that the action presents a question appropriate for special action review.

¶123    In their special action petition, Petitioners asserted jurisdiction under Rule 7(b), which allows Petitioners to file a special action in an appellate rather than trial court in the first instance if they can

persuade the court that their reasons for doing so are sufficient. Ariz. R.P. Spec. Act. 7(b). However, Rule 7 does not expand the questions that may be presented under Rule 3. Indeed, Rule 7(e) provides that a petition must contain a jurisdictional statement, and Rule 7(b) requires that Petitioners must "also" explain why they are seeking initial relief in an appellate court. That language demonstrates that Rule 7(b) is not an independent source of jurisdiction, and that the Rules' other jurisdictional prerequisites must be met.

¶124 Petitioners made no allegation that the question presented was encompassed within the narrow range of issues permitted in a special action by Rule 3. As stated by Petitioners, the question presented was whether "the exclusion of the Initiative Proponents from [the E-Qual] system under these circumstances violate[s] their constitutional rights."

¶125 Although supporting the petition, respondent Secretary of State did not address this Court's jurisdiction. In their response as intervenors, the Speaker of the Arizona House of Representatives and President of the Arizona Senate argued that the Court should decline jurisdiction because the petition did not satisfy Rule 3. In their reply to that response and to intervenor Attorney General's jurisdictional arguments, Petitioners still did not address Rule 3. Rather, they asserted the petition "presents a novel question of Arizona constitutional law of pressing statewide importance."

¶126 That assertion is undeniable and would present strong grounds for this Court to grant a petition for review of an appellate court decision. *See, e.g., State v. Reed*, 248 Ariz. 72, 75 ¶ 5 (2020). And it is certainly relevant to the Court's exercise of special action jurisdiction. *See, e.g., Randolph v. Groscost,* 195 Ariz. 423, 425 ¶ 6 (1999). But it is not adequate to invoke the extraordinary relief of a special action. Rather, as Rule 3 makes unequivocal, the "only questions that may be raised in a special action" are those specified in the rule. Ariz. R.P. Spec. Act. 3.

¶127 This petition presents none of those questions. It does not allege that respondent Secretary of State has discretion to provide the relief requested, nor the duty to do so. Ariz. R.P. Spec. Act. 3(a). It does not allege that respondent has proceeded or is threatening to proceed in any manner, much less in excess of jurisdiction or legal authority. *Id.* at 3(b). Nor does it allege that an official has made any "determination" affecting Petitioners' rights or interests, whether or not arbitrary and capricious or an abuse of

discretion. *Id.* at 3(c). Because the petition does not present a question that may be raised in a special action, the prerequisites are not met to grant jurisdiction or extraordinary relief.

**¶128** The limited questions we are authorized to consider in a special action all present clear and narrow questions of law that the Court may, in many circumstances, be able to readily decide in short order. Our decisions have consistently recognized that special actions must present purely legal issues. *See, e.g., Randolph*, 195 Ariz. at 425 ¶ 6. But that is not enough; they must present the type of issues that were actionable under the common law writs of mandamus or prohibition, which are now consolidated within our special action procedures. *Ariz. Indep. Redistricting Comm'n v. Brewer*, 229 Ariz. 347, 350 ¶ 11 (2012). Thus, our special action decisions typically involve issues of legal authority or obligation on the part of public officials and entities. *See, e.g., id.* (challenging Governor's legal authority to remove the chairperson of the Arizona Independent Redistricting Commission); *Ariz. Early Childhood Dev. & Health Bd. v. Brewer*, 221 Ariz. 467, 470 ¶ 11 (2009) (finding no legislative authority to transfer tobacco tax funds to the general fund); *Forty-Seventh Legislature v. Napolitano*, 213 Ariz. 482, 485–86 ¶ 11 (2006) (holding that a dispute over "[l]imiting the actions of each branch of government to those conferred upon it by the constitution" makes it "one of those rare cases that justify the exercise of our special action jurisdiction").

**¶129** Despite the obvious importance of the issues presented, this is not one of the exceptional cases that call upon us to determine boundaries of constitutional authority or to require public officials to fulfill their clear legal obligations. No one, including respondent Secretary of State, asserts that she possesses authority, discretion, or obligation regarding the relief sought. Rather, the action is premised on the argument that denial of access to E-Qual violates Petitioners' constitutional rights, which is quite different from asserting that the Secretary has discretion and a duty to remedy that violation. Had Petitioners approached the Secretary with a colorable demand to exercise authority to apply E-Qual to initiatives, chances are, given her posture in this case, she would have done so. But no one here asserts she has such authority and refused to exercise it, which is a Rule 3 predicate for a special action sounding in mandamus.

**¶130** Additionally, the action requires us to consider difficult factual issues that are disputed by the parties, including the efficacy of adapting the E-Qual system to the unique constitutional requirements pertaining to initiatives. Respondent Secretary suggests that we would

have to supplement our ruling that the exclusion of initiatives from the system is unconstitutional with additional orders making it possible to effectuate the relief requested. Even if we had authority to do so, such orders would necessarily be predicated on factual determinations that are outside the proper scope of a special action, which is limited to considering purely legal issues of a discrete nature.

¶131        For all of the foregoing reasons, I dissent from the decision to grant jurisdiction; and because the Court prematurely resolved important constitutional issues without the benefit of an evidentiary record, I express no opinion on the merits.